OPINION
{¶ 1} Defendant-appellant, Demetrius R. Wilson, appeals from the judgment of the Franklin County Court of Common Pleas whereby a jury convicted appellant on two counts of murder with firearm specifications and two counts of attempted murder with firearm specifications.
 {¶ 2} The Franklin County Grand Jury indicted appellant on two counts of aggravated murder with death penalty and firearm specifications, in violation of R.C. 2903.01, 2929.04(A)(5),2941.145, and 2941.141. The grand jury also indicted appellant on two counts of attempted aggravated murder with firearm specifications, in violation of R.C. 2903.01, 2923.02, 2941.145, and 2941.141. Lastly, the grand jury indicted appellant on one count of having a weapon while under a disability, in violation of R.C. 2923.13.
 {¶ 3} The above charges pertain to a September 21, 2003 shooting. Specifically, the aggravated murder charges stem from appellant fatally shooting Fortino Guzman-Gutierrez ("Guzman") and Jose Isabel Sandoval-Zarko ("Zarko"), and the attempted aggravated murder charges pertain to appellant shooting Leonel Saucedo and Rashaad Marshall.
 {¶ 4} Appellant pled not guilty and elected to have a bench trial on the weapons under disability charge and a jury trial on the remaining charges. At trial, Clinton Township Police Sergeant Phillip Perry testified as follows on behalf of plaintiff-appellee, the State of Ohio. On the evening of September 21, 2003, the Franklin County Sheriff's Office dispatched Sergeant Perry to Dreamer's Lounge, and Sergeant Perry found Marshall outside the bar. Marshall was frightened and had a wound to his left forearm and in his chest area. Marshall told Sergeant Perry that a Hispanic male shot him.
 {¶ 5} Officer Denny Blust worked for the Mifflin Township Police Department on September 21, 2003, and testified as follows on appellee's behalf. Officer Blust investigated the area where the shooting involving Marshall occurred. Blust saw that someone had fatally shot Guzman, and someone shot Zarko in the back. Zarko was alive at the time, and medics transported him to the hospital. Blust noted at trial that, although the crime scene was not well-lit on the evening of September 21, 2003, it was "not as dark as in going in a cave where you cannot see your hands in front of your face[.]" (Tr. at 141.)
 {¶ 6} Next, Allison Gamble testified as follows on appellee's behalf. On September 21, 2003, Gamble lived in an apartment near where the above noted shooting took place. On the evening of September 21, 2003, Gamble drank alcohol and smoked marijuana with individuals that included appellant, Marshall, Franklin Watkins, and Harold Warner. Gamble did not remember if appellant's brother was also present.
 {¶ 7} That evening, appellant talked about robbing Mexicans. Appellant also had a firearm in his pants waistband. In the course of events, appellant, Marshall, Watkins, and Warner left the apartment, and Gamble stayed at the apartment. Twenty minutes later, Gamble heard six to seven gunshots.
 {¶ 8} Franklin County Sheriff Detective Mike Kirkpatrick testified for appellee that he spoke with Marshall at the hospital during the early morning hours of September 22, 2003. According to Detective Kirkpatrick, Marshall stated that he did not shoot anyone and that a Hispanic male shot him. The detective further testified that he took evidence from Marshall's hands for gunshot residue testing.
 {¶ 9} Franklin Watkins testified to the following on appellee's behalf. On the evening of September 21, 2003, Watkins socialized at Gamble's apartment with individuals including Gamble, Warner, Marshall, appellant, and appellant's brother. Subsequently, Watkins walked with Warner, Marshall, appellant, and appellant's brother to a nearby store. On the way to the store, Marshall told the group that Watkins "told on him" for stealing a video game machine. (Tr. at 236.) Appellant stated that he "would kill anyone who would snitch on him." (Tr. at 237.)
 {¶ 10} Thereafter, when the group returned to the apartment, appellant and Marshall talked about robbing Mexicans that lived nearby. Marshall had a firearm earlier that evening, but appellant had that same firearm in his pants waistband while talking about the robbery. Afterward, Marshall, appellant, appellant's brother, and a "tall guy" went toward the area where the Mexicans lived. (Tr. at 245.) Warner joined the group later, and Watkins eventually joined them. When Watkins joined the group, he and Warner discussed robbing a pizza delivery person. While Watkins called to order the pizza, he heard two gunshots and started to run away. Watkins heard six or seven more gunshots when he ran across the street. Watkins then saw appellant running toward him, and appellant had the firearm.
 {¶ 11} Next, Saucedo testified to the following on appellee's behalf. On September 21, 2003, Saucedo socialized with Zarko and Guzman outside an apartment complex. Two black men approached, and one of them asked for beer. Saucedo gave the man two beers and then continued to talk with his friends. Thereafter, the man who asked for the beer grabbed Guzman, put a firearm to his head, and shot him. Instantly, the man then shot Zarko and Saucedo. The bullet grazed the left side of Saucedo's chest.
 {¶ 12} Subsequently, law enforcement spoke with Saucedo about the shooting and asked Saucedo to identify the shooter in a photo array. Saucedo identified appellant as the shooter.
 {¶ 13} On direct-examination, Saucedo testified that the location of the shooting was not well-lit and that he remembered the shooter's face "a little bit." (Tr. at 305.) Likewise, Saucedo conceded on cross-examination that he did not see the shooter's face clearly and that the "black men" in the photo array "appear[ed] to be a little bit similar." (Tr. at 342.)
 {¶ 14} Warner testified to the following on appellee's behalf. Warner socialized with individuals that included Gamble, Watkins, Marshall, appellant, and appellant's brother during the evening of September 21, 2003. At some point that evening, Warner, Marshall, Watkins, and appellant walked to a nearby store. While walking to the store, Marshall mentioned that Watkins "told on him" for stealing a video game machine. Appellant responded: "`I don't want nobody snitching on me[.]'" (Tr. at 363.)
 {¶ 15} Subsequently, appellant and Marshall started talking about robbing Mexicans who lived nearby. The group walked toward the area where the Mexicans lived. Appellant then pointed a firearm at a Mexican woman holding a baby and stated: "`I could pop her like from here.'" (Tr. at 368.)
 {¶ 16} Meanwhile, Warner decided that the group should rob a pizza delivery person instead. Watkins used his cell phone to order pizza. Appellant and Marshall walked away and, thereafter, Warner heard gunshots. Warner then saw appellant shooting a firearm, although Warner did not see whom appellant was shooting. Warner and Watkins started to run, and appellant, carrying the firearm, ran toward them and stated: "`I shot the mother fucker.'" (Tr. at 376.)
 {¶ 17} Afterwards, Franklin County Sheriff Detective Chris Floyd spoke with Warner about the shooting. Warner provided information to Detective Floyd, and the detective later gave money to Warner. However, the money did not influence Warner's testimony. Lastly, Warner testified that he was a closer friend with Marshall than appellant, and Warner admitted that he was previously charged with falsification, but pled to a misdemeanor disorderly conduct under a plea bargain.
 {¶ 18} Marshall testified to the following on appellee's behalf. Marshall was socializing with individuals including appellant, Gamble, Watkins, and Warner on the evening of September 21, 2003. Marshall never had a firearm that evening, but appellant did.
 {¶ 19} During the evening, Marshall, Warner, Watkins, and appellant walked to a nearby store. On the way to the store, Marshall confronted Watkins about Watkins revealing that Marshall stole a video game machine. Appellant "said that if somebody snitched on him he felt that he would kill them." (Tr. at 439.) Marshall thought that appellant was joking.
 {¶ 20} Afterwards, the group returned to Gamble's apartment complex, and the group talked about robbing a pizza delivery person. Meanwhile, appellant and Marshall left the group and approached some Mexicans that lived nearby. Marshall asked one of the Mexicans for a beer. The Mexican, Guzman, gave Marshall a beer and appellant grabbed Guzman and shot him in the head. Marshall did not expect this to happen, stating: "As far as I know it was robbing the pizza place, and when [appellant] told me to walk with him[,] I walked with him." (Tr. at 456.) Next, appellant turned toward Marshall and pointed the firearm toward Marshall. Marshall tried to grab the firearm, but appellant shot Marshall. Marshall fled and heard six to seven more shots. Marshall went to Dreamer's Lounge to ask for help because he was bleeding and could not breathe.
 {¶ 21} Ultimately, medics transported Marshall to the hospital. At the hospital, a law enforcement officer took samples from Marshall's hands for a gunshot residue test. Marshall had not washed his hands between the time that he was at Dreamer's Lounge and the time that law enforcement took the gunshot residue samples.
 {¶ 22} On direct examination, Marshall admitted that he first told law enforcement that a Mexican shot him, and that he lied when he made that statement. Marshall further noted that he later falsely told law enforcement that an "unknown subject approached" him and shot him. (Tr. at 426.) Likewise, Marshall admitted to also telling law enforcement that a drug dealer named "G" shot him, and that he again lied when he made that statement. (Tr. at 426.) However, Marshall verified that he ultimately told law enforcement the truth, which was that appellant shot him.
 {¶ 23} In addition, on direct examination, Marshall testified that appellee charged him with three counts of felony obstruction of justice because of his failure to initially tell the truth about the shooting. Marshall acknowledged that appellee allowed him to plead to one count of obstruction of justice with the possibility of community control in exchange for him testifying against appellant. Likewise, Marshall noted that he was convicted of aggravated robbery and aggravated burglary in 2001.
 {¶ 24} On cross-examination, Marshall acknowledged that he previously told Warner that appellant was not trying to shoot him, but was trying to protect his life. Marshall also stated on cross-examination that he gave different accounts of the incident because he was scared "for [his] life" due to appellant's actions. (Tr. at 487.)
 {¶ 25} Ohio Bureau of Identification and Investigation Forensic Scientist Martin Lewis testified on behalf of appellee that he examined the gunshot residue test samples that law enforcement took from Marshall's hands. Lewis stated that he found no gunshot residue from the samples.
 {¶ 26} Detective Floyd investigated the September 21, 2003 shooting incident and testified as follows on appellee's behalf. First, Detective Floyd learned that Guzman was dead at the crime scene and that Zarko died at the hospital. Next, Detective Floyd spoke with Marshall about the incident, and Marshall originally indicated that a light-skinned man, either black or Hispanic, shot him. Thereafter, Marshall indicated that a man nicknamed "G" shot him. (Tr. at 647.) Ultimately, Marshall confessed that appellant was the shooter. Detective Floyd then asked Marshall to identify appellant in a photo array, but Marshall refused, stating that he was afraid for his family. Marshall also asked what Detective Floyd was "going to do for him[.]" (Tr. at 655.) At a later time, Marshall identified appellant in the photo array.
 {¶ 27} Detective Floyd also talked with Saucedo about the incident. Saucedo identified appellant in a photo array as the shooter. Detective Floyd also showed Saucedo a photo array with Marshall's photograph, but Saucedo was unable to pick anyone out of that photo array. Likewise, Gamble, Watkins, and Warner spoke with Detective Floyd and provided information about appellant's identity and activities during the evening of September 21, 2003. Eventually, Detective Floyd issued a warrant for appellant's arrest, and appellant surrendered himself at the jail on October 20, 2003. Appellant had no gunshot wounds when he went to jail.
 {¶ 28} On direct examination, Detective Floyd verified that he gave Warner $20 after Warner provided information about appellant. Likewise, Detective Floyd indicated that his partner gave Gamble $50 after she provided information about appellant. The money came from the "[f]urther of justice fund, which is seized money." (Tr. at 666.)
 {¶ 29} Detective Floyd explained that he gave money to Warner because:
A. At the time of the interview [Warner] had some crisis in his life and he needed his driver's license or something like that and he was cooperative so it's not uncommon in cases like this to pay informants by buying them dinner or cigarettes or pop * * *.
(Tr. at 665-666.) Detective Floyd explained that his partner gave money to Gamble because "[w]e had disrupted [Gamble's] life at that time and she was cooperative[.]" (Tr. at 666.)
 {¶ 30} Next, Dr. Patrick Fardal from the Franklin County Coroner's Office testified on appellee's behalf that Zarko "died as a result of [a] gunshot wound to the trunk, injuries to the thoracic spinal cord and to the right lung and subsequent internal bleeding." (Tr. at 775.) Dr. Fardal testified that Guzman "died solely and exclusively as a result of suffering a contact gunshot wound to his head which was perforation of the skull and brain, along with a secondary gunshot wound to the trunk, which caused injuries to his left lung, and subsequently causing internal hemorrhaging[.]" (Tr. at 764-765.)
 {¶ 31} The jury found appellant not guilty of the aggravated murder charges, but guilty of the lesser-included offenses of murder in regards to the death of Guzman and Zarko. The jury also found appellant not guilty of the attempted aggravated murder charges, but guilty of the lesser-included offenses of attempted murder in regards to the shooting of Saucedo and Marshall. In addition, the jury found appellant guilty on all accompanying firearm specifications. Appellee dismissed the weapon under disability charge.
 {¶ 32} At the sentencing hearing, appellant's defense counsel noted that appellant "has no adult record of any significance[.]" (Tr. at 815.) Appellant also mentioned during the sentencing hearing that "the person who did these * * * is still out there[.]" (Tr. at 816.) Thereafter, the trial court sentenced appellant to 15 years to life imprisonment on each of the murder convictions and nine years imprisonment on each of the attempted murder convictions. The trial court merged the firearm specifications and sentenced appellant to three years imprisonment on the merged specifications. The trial court ordered appellant to serve each prison term consecutively.
 {¶ 33} In imposing the sentence, the trial court stated:
The one victim was Mr. Guzman, and Mr. Guzman had this gun placed in the back of his head and was shot point blank and was killed instantly.
Mr. Zarko was shot in the back severing his spine and he was taken to the hospital and he died at the hospital.
There were two other gentlemen there that were shot, Mr. Marshall was shot in the left arm and Mr. Saucedo was shot in the torso area.
* * *
Now, the court makes a finding that the consecutive sentences are worth it and necessary to protect the public and to punish you, the offender; and the murders the court finds are the worst kind of offenses and the court makes that finding, and the court also makes a finding that these sentences are consecutive sentences and are not disproportionate to your conduct and to the danger imposed by you, the defendant.
Now, the court further makes a finding, because of the age of this offender, and it is likely that this offender will commit similar offenses in the future, the court further finds that the sentence imposed and the consecutive sentences imposed do not demean the seriousness of the offenses, and the court finds that it is appropriate to impose the consecutive sentences because of the nature of the offenses committed, and the court underscores the fact that the offenses committed are not disproportionate to the conduct that was imposed by this defendant.
* * *
* * * Now, relative to consecutive sentencing, I set forth in my findings relative to those matters to consecutive sentences and I do wish to place on the record that the court has made a finding that the harm imposed relative to these offenses so great, so unusual that there could be no single term; and that's the reason the court imposed consecutive sentences. No single term could adequately reflect the seriousness of your conduct, and the court imposed consecutive sentences having made that finding.
(Tr. at 817-819, 821.)
 {¶ 34} Appellant appeals, raising three assignments of error:
I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF MURDER AND ATTEMPTED MURDER AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY IMPROPERLY SENTENCING HIM TO CONSECUTIVE TERMS OF ACTUAL INCARCERATION IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES.
III. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY IMPROPERLY SENTENCING HIM TO TERMS OF ACTUAL INCARCERATION WHICH WERE LONGER THAN THE MINIMUM TERMS IN CONTRAVENTION OF OHIO'S SENTENCING STATUTES.
 {¶ 35} In his first assignment of error, appellant first contends that his convictions are based on insufficient evidence. We disagree.
 {¶ 36} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. State v. Thompkins (1997),78 Ohio St.3d 380, 386. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307; State v.Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 78. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact.Jenks at 273. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See Jenks, paragraph two of the syllabus; Yarbrough at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim); State v. Lockhart (Aug. 7, 2001), Franklin App. No. 00AP-1138.
 {¶ 37} We first address appellant's murder convictions that pertained to Guzman and Zarko's death. R.C. 2903.02(A) defines murder and states: "No person shall purposely cause the death of another[.]" An individual acts purposely when he or she has a "specific intention to cause a certain result[.]" R.C.2901.22(A).
 {¶ 38} A jury may infer a purpose to cause death from a defendant inflicting a wound upon a person with a deadly weapon in a manner calculated to kill. State v. Stallings (2000),89 Ohio St.3d 280, 291; State v. Wilson (Nov. 2, 2000), Franklin App. No. 99AP-1259. In making such an inference, the jury may consider the places where bullets entered the victim and the resulting wounds. State v. Strodes (1976), 48 Ohio St.2d 113,116, death penalty vacated (1978), 438 U.S. 911; Wilson.
 {¶ 39} Here, Saucedo and Marshall testified that appellant killed Guzman with a firearm, a deadly weapon. See R.C.2923.11(B)(1). Appellant held the firearm to Guzman's head and the bullet perforated Guzman's brain, a vital organ. Such evidence allowed the jury to infer that appellant purposely killed Guzman. See Stallings at 291; Strodes at 116;Wilson. The jury also properly concluded that appellant purposely killed Zarko, given Saucedo's testimony that appellant instantly shot Zarko with a deadly weapon after killing Guzman, and given that Zarko sustained gunshot wounds to his vital organs, the lung and spinal cord. See Stallings at 291;Strodes at 116; Wilson. Lastly, appellant revealed his state of mind to commit the purposeful killings when, prior to the shootings, appellant pointed a firearm at a Mexican woman holding a baby and stated: "`I could pop her * * * from here.'" (Tr. at 368.)
 {¶ 40} Next, we address appellant's attempted murder convictions that pertained to Saucedo and Marshall. The elements of attempted murder are a person purposely engaging in conduct that, if successful, would cause another's death. R.C. 2923.02
and 2903.02; State v. Kidder (1987), 32 Ohio St.3d 279, 283.
 {¶ 41} Here, the jury properly inferred that appellant committed attempted murder against Marshall and Saucedo upon considering that appellant instantly shot them after appellant fatally wounded Guzman and Zarko, and upon considering Marshall's testimony that he actually pointed the firearm toward him before shooting him. Similarly, the jury could have properly inferred that, due to appellant's previous statement that he would kill anybody who "snitched" on him, appellant had a purpose to kill Saucedo and Marshall to silence them after appellant had just shot Guzman and Zarko.
 {¶ 42} Accordingly, based on the above, we conclude that there is sufficient evidence to support appellant's murder and attempted murder convictions. Next, appellant argues in his first assignment of error that his convictions are against the manifest weight of the evidence. Again, we disagree.
 {¶ 43} In determining whether a verdict is against the manifest of the evidence, we sit as a "thirteenth juror."Thompkins at 387. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "`whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id. quoting State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Columbus v. Henry (1995),105 Ohio App.3d 545, 547-548. We reverse a conviction on manifest weight grounds for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins at 387, quoting Martin at 175. Moreover, "`it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, Franklin App. No. 02AP-11, 2002-Ohio-5345, at ¶ 10, quoting State v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511.
 {¶ 44} Appellant first argues that his convictions are against the manifest weight of the evidence by claiming that Warner's and Marshall's testimonies are not credible. In challenging the credibility of Warner, appellant notes that Detective Floyd paid Warner money after Warner provided a witness statement. Further, appellant notes that Warner testified that he was a closer friend with Marshall than with appellant, and that Warner had been previously charged with falsification.
 {¶ 45} In challenging the testimony of Marshall, appellant asserts that Marshall previously gave several inconsistent accounts as to who committed the shootings. Appellant also emphasizes that appellee charged Marshall with three counts of obstruction of justice and that, in exchange for his testimony against appellant, appellee allowed Marshall to plead guilty to only one of those counts with the possibility of getting community control and avoiding prison.
 {¶ 46} Appellant further claims that his convictions are against the manifest weight of the evidence by arguing that Saucedo's testimony has little weight. As noted above, Saucedo testified that appellant shot him and fatally wounded Guzman and Zarko. However, appellant claims that Saucedo misidentified appellant as the shooter because Marshall testified that he asked for a beer before the shooting and that Saucedo testified that the man who asked for a beer was the shooter. In further arguing that Saucedo misidentified appellant as the shooter, appellant highlights that Saucedo testified that the crime scene was not well-lit and that Saucedo claimed that he only remembered appellant's face "a little bit." (Tr. at 305.) Appellant also emphasizes that Saucedo conceded that he did not see the shooter's face clearly, and that he testified that the "black men" in the photo array with appellant "appear[ed] to be a little bit similar." (Tr. at 342.)
 {¶ 47} However, the jury did not lose its way in ultimately believing Saucedo's, Marshall's, and Warner's testimony that appellant was the shooter during the September 21, 2003 incident given that other witnesses testified that appellant had a firearm just before and after the shooting. In particular, Watkins saw appellant with the firearm shortly after he heard the gunshots. Likewise, the following evidence discounts appellant's assertion that Marshall, not appellant, was the shooter: (1) after the incident, law enforcement found no gunshot residue on Marshall's hands; (2) Marshall, not appellant, sustained gunshot injuries from the incident; and (3) Saucedo did not identify Marshall in a photo array that included Marshall's photograph.
 {¶ 48} In addition, Saucedo's testimony is not incredible just because the crime scene was not well-lit, because Officer Blust confirmed that there was some visibility in the area. Similarly, Warner's testimony is not incredible just because Detective Floyd paid Warner money, because Detective Floyd paid the money after Warner had already told the detective what had happened, and Warner confirmed that the money did not influence his testimony.
 {¶ 49} Lastly, we conclude that the jury had cause not to discount Marshall's testimony despite his different accounts of the incident and previous refusal to implicate appellant. Appellant announced before the incident that he would kill anyone who "snitched" on him. Although Marshall initially thought that appellant was joking when he made that statement, Marshall testified that he provided inconsistent accounts of the incident because he was scared for his life due to appellant's actions and, at one point, Marshall declined to identify appellant to Detective Floyd in a photo array because Marshall was afraid for his family.
 {¶ 50} Accordingly, we conclude that appellant's convictions are not against the manifest weight of the evidence. Having also concluded that appellant's convictions are not based on insufficient evidence, we overrule appellant's first assignment of error.
 {¶ 51} Appellant asserts in his second assignment of error that the trial court failed to follow statutory guidelines when it ordered him to serve consecutive sentences. We disagree.
 {¶ 52} Initially, we recognize that appellant does not challenge the trial court's decision to order appellant to serve the firearm specification sentence consecutive to sentences on appellant's underlying offenses because such a consecutive sentence is mandatory. See R.C. 2929.14(D)(1)(a) and (b);2929.14(E)(1)(a). As for appellant's other convictions, R.C.2929.14(E)(4) governs when trial courts may impose consecutive sentences and states, in pertinent part:
(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
* * *
(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 53} A trial court must make the findings under R.C.2929.14(E)(4) and state its reasons for making those findings. R.C. 2929.19(B)(2)(c); State v. McDonald, Franklin App. No. 03AP-853, 2004-Ohio-2571, at ¶ 17. A trial court is required to provide these findings and reasons during the sentencing hearing.State v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, at ¶ 20. Likewise, the record must support the trial court's findings and reasons by clear and convincing evidence. R.C. 2953.08(G)(2)(a). Clear and convincing evidence is:
* * * "[T]hat measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." Crossv. Ledford (1954), 161 Ohio St. 469, 477 * * *.
State v. Eppinger (2001), 91 Ohio St.3d 158, 164.
 {¶ 54} We will remand a sentence if the trial court failed to make the requisite statutory findings and reasons to support such findings or made findings and reasons devoid of evidentiary support. State v. Worrell, Franklin App. No. 04AP-410,2005-Ohio-1521, at ¶ 64; State v. Altalla, Franklin App. No. 03AP-1127, 2004-Ohio-4226, at ¶ 7.
 {¶ 55} Here, appellant claims that the trial court failed to make the required findings when it imposed consecutive sentences. However, the trial court recognized that consecutive sentences are necessary to protect the public from future offenses and to punish appellant. In addition, the trial court indicated that consecutive sentences are not disproportionate to the seriousness of the offenses. Furthermore, the trial court found that consecutive sentences are not disproportionate to the danger that appellant poses to the public. Lastly, upon analyzing the multiple offenses that took place as part of a course of conduct, the trial court recognized that consecutive sentences are warranted because the harm caused by the offenses was so great or unusual that no single prison term would adequately reflect the seriousness of appellant's conduct. Thus, the trial court made the statutorily enumerated findings in R.C. 2929.14(E)(4).
 {¶ 56} Appellant also contends that the trial court failed to specify the requisite reasons to support its findings and that the evidence does not support consecutive sentences. However, as noted above, the trial court supported its decision to impose consecutive sentences by analyzing how appellant victimized four people in a brutal shooting, which involved one person being fatally shot "point blank" in the head and another person dying from a gunshot wound that severed his spine. Such evidence supports the trial court's R.C. 2929.14(E)(4) findings that: (1) consecutive sentences are necessary to punish appellant; (2) consecutive sentences are not disproportionate to the seriousness of appellant's conduct; and (3) the harm caused by appellant's multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of the courses of conduct would adequately reflect the seriousness of appellant's conduct.
 {¶ 57} By concluding that appellant is likely to commit similar offenses in the future, the trial court supported its R.C. 2929.14(E)(4) findings that consecutive sentences are necessary to protect the public from future crime and that consecutive sentences are not disproportionate to the danger that appellant poses to the public. The record supports the trial court's conclusions because appellant blamed others for his conduct when he stated that "the person who did these * * * is still out there[.]" (Tr. at 816.) Appellant's "failure to acknowledge and appreciate the seriousness of his crime demonstrates that [he] was likely to continue such activities, and consecutive sentences [are] necessary to protect the public from this future conduct." Altalla at ¶ 10; Worrell at ¶ 68.
 {¶ 58} Accordingly, we conclude that the trial court did not err by imposing consecutive sentences. As such, we overrule appellant's second assignment of error.
 {¶ 59} We next address appellant's third assignment of error, which also concerns his prison sentence. Initially, we note that appellant's third assignment of error does not challenge the trial court's 15-years-to-life prison sentences on the murder convictions or the three-year prison sentence on the merged firearm specifications. Such sentences are mandatory under the sentencing statutes. See R.C. 2929.02(B); 2941.145;2929.14(D)(1)(a)(ii).
 {¶ 60} Rather, appellant's third assignment of error concerns his nine-year prison sentences on the attempted murder convictions, which are first-degree felonies. See R.C.2923.02(E). The nine-year prison terms for the first-degree felonies exceed the minimum three years that the felony sentencing statutes authorize for such felonies. R.C. 2929.14(A). In his third assignment of error, appellant contends that the trial court failed to comply with the felony sentencing statutes when imposing non-minimum prison terms on the attempted murder convictions. We agree.
 {¶ 61} In order to impose a non-minimum prison term on a defendant, like appellant, who previously has not served a prison term, the trial court must find: (1) the shortest prison term will demean the seriousness of the defendant's conduct; or (2) the shortest prison term will not adequately protect the public from future crime by the defendant or others. R.C. 2929.14(B). The trial court must make these findings at the sentencing hearing. Comer at ¶ 26. However, the trial court is not required to provide reasons behind its R.C. 2929.14(B) findings.State v. Edmonson (1999), 86 Ohio St.3d 324, 326; Comer at ¶ 26, fn. 2. The trial court's sentence is "contrary to law" and subject to remand if, by clear and convincing evidence, the trial court failed to make the requisite statutory findings. Altalla
at ¶ 7; State v. Alexander, Franklin App. No. 04AP-1181,2005-Ohio-3281, at ¶ 6.
 {¶ 62} Here, the trial court failed to find that the shortest prison term on the attempted murder convictions would demean the seriousness of appellant's conduct, or that the shortest prison term would not adequately protect the public from future crime by appellant or others. Although the trial court concluded that "it is likely that [appellant] will commit similar offenses in the future," the trial court made no mention of whether the shortest prison terms on the attempted murder convictions would not adequately protect the public from future crime by appellant or others. In addition, while the trial court also concluded that "the consecutive sentences imposed do not demean the seriousness of the offenses," the trial court did not determine whether non-minimum sentences on the attempted murder convictions are necessary because the shortest prison terms would demean the seriousness of appellant's conduct. Lastly, although in imposing consecutive sentences the trial court concluded that "the murders * * * are the worst kind of offenses[,]" the trial court did not make such a finding on the attempted murders and did not find whether the attempted murders were such that the shortest prison terms would demean the seriousness of appellant's conduct.
 {¶ 63} Accordingly, we conclude that the trial court did not make the requisite R.C. 2929.14(B) findings when imposing non-minimum sentences on appellant's attempted murder convictions. We emphasize that we do not reach the question of whether non-minimum sentences were warranted in this case, or whether the record would otherwise support their imposition if the trial court made the required statutory analysis. We hold only that the trial court did not follow the proper procedure to impose non-minimum sentences. As such, we sustain appellant's third assignment of error.
 {¶ 64} In summary, we overrule appellant's first and second assignments of error, and sustain appellant's third assignment of error. As such, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas, and we remand this cause to the trial court for further proceedings consistent with this opinion.
Judgment affirmed in part, reversed in part, and causeremanded.
Klatt, P.J., and Deshler, J., concur.
Deshler, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.