NUNC PRO TUNC OPINION[1]
[1] This Nunc Pro Tunc Opinion was issued to correct a clerical error contained in the original opinion released on May 29, 2007, and is effective as of that date. This Nunc Pro Tunc Opinion removes the prior reference to "remanded with instructions."
{¶ 1} Defendant-appellant, Tiy N. Johnson, appeals from the judgment of the Franklin County Court of Common Pleas, whereby the trial court convicted appellant of murder with a firearm specification, pursuant to a jury trial.
 {¶ 2} The Franklin County Grand Jury indicted appellant on one count of aggravated murder, in violation of R.C. 2903.01, in regards to the February 10, 2005 fatal shooting of Larry Portis, Jr. The grand jury also indicted appellant on three counts of intimidation of a crime victim or witness, in violation of R.C. 2921.04. The above four counts each contained two firearm specifications pursuant to R.C. 2941.141 and2941.145.
 {¶ 3} Appellant pled not guilty, and a jury trial ensued. At trial, Bryan Leslie testified on behalf of plaintiff-appellee, the State of Ohio. Leslie first confirmed at trial that, in 1994, he was convicted of felony receiving stolen property.
 {¶ 4} Next, Leslie testified to the following. Around 4:30 a.m. on February 10, 2005, Leslie was talking with Portis in the kitchen of a residence on East 18th Avenue, which is a residence known as a place where people purchase and use drugs. Leslie had not used drugs that morning. Leslie testified that appellant entered the kitchen, approached Portis, and asked him for an apology. Portis "just kept saying, `no, no.'" (Tr. at 33.) Afterwards, appellant brandished a firearm. Portis "attempted to reach for" the firearm, and appellant fired six shots. (Tr. at 33.) Appellant was standing "[d]irectly in front of" Portis when she shot him. (Tr. at 36.) Leslie noticed that the "first shot went through [Portis'] hand and I believe through his head." (Tr. at 39.) The second shot "looked as if it was aimed a little lower, hit him in the chest." (Tr. at 39.) *Page 3 
 {¶ 5} On cross-examination, Leslie testified that he did not see Portis with a firearm on February 10, 2005. Leslie also testified that Portis "appeared to go for" the firearm after appellant brandished it, but she refused to testify that Portis "tried to grab it." (Tr. at 56.)
 {¶ 6} Staci Taylor also testified on appellee's behalf. At trial, Taylor verified that she was being incarcerated for drug possession. Taylor also testified that she has an extensive felony record, which includes a felony receiving stolen property conviction.
 {¶ 7} Taylor then testified to the following. Taylor lived at the East 18th Avenue residence on February 10, 2005, and appellant and Portis were also at the residence on that date. Appellant and Portis "were bickering at one another. She was wanting him to apologize for something that had happened earlier * * *. She just kept telling him that she thought he owed her an apology. * * * [S]he said she was going to make him apologize to her because he should be sorry for what he did." (Tr. at 96-97.) However, Portis displayed "an attitude" and refused to apologize. (Tr. at 97.)
 {¶ 8} Taylor then testified:
 I was sitting at the table just messing around. And it all just happened so fast. They were talking and it didn't even seem serious. Like she was just, you know, pissed he wouldn't even tell her he was sorry. And next thing I know, I started hearing shots.
* * *
 * * * [Appellant] was standing right there in the kitchen, in the doorway standing right over top of [Portis].
(Tr. at 97-98.)
 {¶ 9} Taylor testified that, after the shooting, appellant stated that," `if anybody talks, there will be more of the same[,]'" and appellant ran out of the house. (Tr. at 98.) *Page 4 
 {¶ 10} On cross-examination, Taylor testified that, at the time of the shooting, she was drinking, smoking crack, and getting high. Taylor also testified on cross-examination that Portis was belligerent with appellant before the shooting. *Page 5 
 {¶ 11} Lastly, the following cross-examination of Taylor took place:
 Q. And I believe you indicated that [appellant] pulled out a gun?
 A. Sort of. I didn't actually see her pull out the gun. I heard the gun.
 Q. And you didn't actually see the shooting, you just heard the sounds?
 A. The first couple of shots I was like in a daze. Like I said, I wasn't even sure, I was thinking it was a, you know, a fake gun or something like they was playing. From where I was sitting, her — she was in the doorway. So until he actually fell forward, I seen those two shots and I seen the gun. It was like he fell forward as she was shooting down at him.
 Q. * * * Did you tell the detective that when the gun came out that he tried to grab the gun?
 A. It is like doing it in slow motion. I don't know if he was already hit. He could have already been dead and his body was just reflexing. But it was like — it was almost like it went slow motion. He stood up and was reaching toward her and he just fell forward.
 Q. So in your mind you don't know when he was reaching for this gun? In other words, when she pulled it out, he could have been reaching for it, or he could have been shot already?
 A. I had already heard shots.
 Q. When you saw him stand up? *Page 6 
 A. Yes, when I seen, yes. Getting out of his chair and just getting out of his chair and at the same token, you know, reaching towards where the shots were coming from.
(Tr. at 109-111.)
 {¶ 12} Former Franklin County Coroner employee Dr. Patrick Fardal examined Portis and testified to the following on appellee's behalf. Portis was six feet tall and weighed 176 pounds. Portis sustained two wounds, one lethal and one non-lethal. The non-lethal wound:
 * * * [H]ad an entrance gunshot wound on the palm of his * * * right hand. And basically it was about a three-quarter by one-half inch defect. * * *
 And around this defect there was soot, powder residue. And this soot means that * * * the target distance was less than 6 inches when the gun was discharged. * * *
(Tr. at 127.)
 {¶ 13} The fatal injury:
 * * * [W]as to the back of [Portis'] head. He had a defect in his left occipital scalp * * * and it was about a three-eighths by one-half inch defect.
 * * *
 * * * This wound, I didn't see any soot or stippling around it. So this man was wearing some kind of hat or hood or something else like that that there was — and this would be what we would call an intermediate target that would absorb some of the powder residues. The soot and stippling, this would indicate a muzzled target distance of greater than two to three feet in order to sustain this type of gunshot wound. Basically this bullet went into his skull and went through the left side of his brain and lodged on the bones just above his ear, middle ear here. * * *
(Tr. at 128-129.) *Page 7 
 {¶ 14} Dr. Fardal also testified that "it is a possibility" that Portis "could have had his hand * * * on the back of his head * * * and the bullet could have went through his hand and then into his skull." (Tr. at 129.) However, Dr. Fardal equivocated that, "since I didn't find any * * * parts of his hand bones or anything else like that within the skull, I can't say for sure that that is what happened." (Tr. at 129.)
 {¶ 15} On cross-examination of Dr. Fardal, the following exchange took place:
 Q. * * * [I]f a bullet was shot and hit something behind a person and then entered through the back, would that be consistent with what occurred in this case? * * *
 * * *
 A. It could be from a ricocheted shot, that is correct.
(Tr. at 135.) Dr. Fardal also hypothesized that, with someone sustaining a hand wound like Portis, "[i]t could be that they had grabbed the end of the gun" when it was shot. (Tr. at 140.)
 {¶ 16} Columbus Police Detective David Ramey testified that he investigated the scene of the shooting incident and found bullet fragments on the kitchen floor and a bullet in a window frame. Detective Ramey also testified that he found "a live round [of ammunition] recovered on top of the refrigerator[.]" (Tr. at 147.)
 {¶ 17} Ultimately, appellee rested its case. Thereafter, on appellee's motion, the trial court dismissed the intimidation counts and amended the aggravated murder charge to a murder charge.
 {¶ 18} Next, appellant testified on her own behalf. Appellant testified that she is 24 years old and that she was previously a prostitute for Portis. Next, appellant testified to the following. Appellant was scared of Portis, and appellant knew that Portis carried *Page 8 
a firearm. In addition, Portis had previously assaulted appellant. As an example, Portis had knocked appellant's teeth out with the butt of a firearm.
 {¶ 19} During the early morning hours of February 10, 2005, appellant approached Portis in the kitchen at the East 18th Avenue residence to explain to him that she was pregnant and she thought maybe she could "just get off the streets[.]" (Tr. at 186.) However, Portis started to argue and, according to appellant, who had a firearm:
 I take the gun and set it * * * on the counter. * * * I stood, I get in a squatting position. * * *
 I said, "Larry, I want to take this baby and I want to do something. I want to change it. I want to make a change. I want to do something with this."
(Tr. at 189.)
 {¶ 20} Appellant testified that Portis continued to argue and:
 At that time [Portis] stands up. He reaches for the gun. I stand up. I [grab] the gun too. We are fighting over the gun. That is why the bullets went everywhere. I never once stood behind him and shot him. * * * We were tussling over the gun. I never once stood behind him and shot him.
 * * * I ain't no killer or no murderer. I never once stood behind him and shot him.
(Tr. at 190.)
 {¶ 21} Appellant also testified that, if Portis would have grabbed the firearm during the struggle, she would "probably be dead right now." (Tr. at 193.) Likewise, during her testimony, appellant's trial counsel asked appellant: "At any time did you go behind [Portis] to shoot him in the back of the head?" (Tr. at 190.) Appellant responded: "No. * * * I wasn't never trying to shoot him." (Tr. at 190.) Similarly, *Page 9 
appellant's trial counsel asked appellant: "Was it your intention to shoot Larry Portis?" (Tr. at 193.) Appellant responded: "No, sir." (Tr. at 193.)
 {¶ 22} Next, appellant testified that she realized that Portis was shot when "everything was over. * * * I just remember just dropping, like he dropped and I dropped everything and I just dropped the gun and I ran out the door." (Tr. at 192.) Lastly, appellant testified on direct examination that she is five feet three inches tall and that she weighed 98 pounds in February 2005.
 {¶ 23} On cross-examination, appellant explained that, while talking to Portis during the early morning hours of February 10, 2005, she squatted next to Portis because "[w]hen I am high, that is usually how I talk, I just always squat." (Tr. at 195.) On re-direct examination, appellant testified that, when law enforcement subsequently told appellant that Portis was shot in the back of the head, she responded that "there is no possible way I could have shot him in the back of the head because never once did I get behind him." (Tr. at 202.)
 {¶ 24} After appellant rested her case, and before the jury deliberated, appellant's trial counsel requested that the trial court instruct the jury on self-defense. The trial court refused, concluding that: "I do find from the evidence that [appellant] clearly has some fault, and that she would not be entitled to the defense of self-defense, and I am not going to charge on that." (Tr. at 212.)
 {¶ 25} The trial court did provide the following jury instructions:
 * * * The defendant must be acquitted of an offense unless [appellee] produces evidence that convinces you beyond a reasonable doubt of every element of the offense. *Page 10 
* * *
 [Appellant] is charged with murder in the indictment. Before you can find [appellant] guilty, you must find beyond a reasonable doubt that on or about the 10th day of February, 2005, in Franklin County, Ohio, [appellant] purposely caused the death of Larry Portis.
 A person acts purposely when it is his or her specific intention to cause a certain result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing.
(Tr. at 239, 243.)
 {¶ 26} Thereafter, the jury found appellant guilty of murder with the accompanying firearm specifications, and the trial court sentenced appellant accordingly. On July 17, 2006, the trial court issued a judgment entry journalizing appellant's conviction and sentence. However, the trial court failed to journalize in the judgment entry the dismissal of the three intimidation charges.
 {¶ 27} Appellant appeals, raising three assignments of error:
 ASSIGNMENT OF ERROR NUMBER ONE
 THE TRIAL COURT ERRED WHEN IT REFUSED TO INSTRUCT THE JURY ON THE AFFIRMATIVE DEFENSE OF SELF-DEFENSE, AS REQUESTED BY THE DEFENDANT, AND FURTHER COMMITTED PLAIN ERROR WHEN IT REFUSED TO INSTRUCT ON THE DEFENSE OF ACCIDENT. THE DEFENDANT WAS ALSO DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL DUE TO THE FAILURE TO REQUEST A JURY INSTRUCTION ON THE DEFENSE OF ACCIDENT.
 ASSIGNMENT OF ERROR NUMBER TWO
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT ON THE CHARGE OF MURDER WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTION AND THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THE STATE FAILED TO PROVE THAT THE DEFENDANT PURPOSELY KILLED *Page 11 
THE DECEDENT AND HER ACTIONS WERE JUSTIFIED AS SELF-DEFENSE.
 ASSIGNMENT OF ERROR NUMBER THREE
 THE TRIAL COURT ERRED WHEN IT FAILED TO ENTER A JUDGMENT OF ACQUITTAL ON THE CRIM.R. 29 MOTION AT THE CLOSE OF THE STATE'S CASE AFTER IT WAS DETERMINED THAT THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CHARGES OF WITNESS INTIMIDATION.
 {¶ 28} We begin with appellant's second assignment of error. In her second assignment of error, appellant first argues that her murder conviction is based on insufficient evidence. We disagree.
 {¶ 29} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime. State v. Hancock 108 Ohio St.3d 57, 2006-Ohio-160, at ¶ 34, following Jackson v. Virginia (1979), 443 U.S. 307, 319; State v.Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 78. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact. State v.Jenks (1991), 61 Ohio St.3d 259, 273. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See Jenks, paragraph two of the syllabus; Yarbrough at ¶ 79 (noting that courts do not evaluate witness credibility *Page 12 
when reviewing a sufficiency of the evidence claim); State v.Lockhart (Aug. 7, 2001), Franklin App. No. 00AP-1138.
 {¶ 30} Initially, appellant contends that her murder conviction is based on insufficient evidence because she acted in self-defense. Self-defense is an affirmative defense. State v. Williford (1990),49 Ohio St.3d 247, 248. We do not consider affirmative defenses in a sufficiency of the evidence analysis. See State v. Cooper, Lawrence App. No. 06CA4, 2007-Ohio-1186, at ¶ 15. Such is the case because:
 * * * Under the sufficiency test, the state is entitled to have the case decided by the jury when it has presented enough credible evidence going to every element of the crime so that a reasonable jury could find the defendant guilty beyond a reasonable doubt if it believed that evidence. An affirmative defense does not negate the legal adequacy of the state's proof for purposes of submitting it to the jury. An affirmative defense involves an excuse or justification for doing an otherwise illegal act. See R.C. 2901.05(C)(2). It does not deny the existence of the act; it simply provides a legal justification for it. * * *
Id.
 {¶ 31} Accordingly, "[o]nce the state has satisfied the question of legal adequacy * * *, the question of relative persuasiveness" of a self-defense affirmative defense "must await * * * appellate scrutiny under a manifest weight of the evidence analysis." Id. As such, we find no merit to appellant's claim that her murder conviction is based on insufficient evidence under the theory that she acted in self-defense.
 {¶ 32} Next, appellant claims that her murder conviction is based on insufficient evidence because the record failed to establish that appellant purposely killed Portis. R.C. 2903.02(A) defines murder and states that "[n]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy." An individual acts *Page 13 
purposely when he or she has a "specific intention to cause a certain result[.]" R.C. 2901.22(A).
 {¶ 33} A trier of fact may infer a purpose to cause death from a defendant inflicting a wound upon a person by using a deadly weapon in a manner calculated to kill. State v. Stallings (2000), 89 Ohio St.3d 280,291; State v. Wilson, Franklin App. No. 05AP-277, 2006-Ohio-643, at ¶ 38. In making such an inference, the trier of fact may consider the places where bullets entered the victim and the resulting wounds.State v. Strodes (1976), 48 Ohio St.2d 113, 116, death penalty vacated (1978), 438 U.S. 911; Wilson at ¶ 38.
 {¶ 34} Here, Leslie testified that appellant shot Portis with a firearm, a deadly weapon. R.C. 2923.11(B)(1). Portis sustained a gunshot wound to his brain, a vital organ. Such evidence allowed the jury to infer that appellant purposely killed Portis. See Stallings at 291;Strodes at 116; Wilson at ¶ 39. And, appellant's purpose to cause Portis' death also stems from the combined testimony of Leslie and Taylor that appellant fired multiple shots at close range into Portis. See State v. Harris (July 9, 1981), Cuyahoga App. No. 43238.
 {¶ 35} We further conclude that appellant's post-crime behavior suggests her guilt for murder. "A person's post-crime behavior `is considered relevant to the question of guilt' because `the commission of a crime can be expected to leave some mental traces on the criminal.'"State v. Henry, Franklin App. No. 04AP-1061, 2005-Ohio-3931, at ¶ 38, quoting Thomas v. State (Md. 2002), 372 Md. 342, 812 A.2d 1050, 1056, citing 1 Wigmore, Evidence (3rd Ed.1940) 632, Section 173. Here, after shooting Portis, appellant fled. Flight is akin to "an admission by conduct which expresses *Page 14 
consciousness of guilt." United States v. Martinez (C.A.10, 1982), 681 F.2d 1248, 1256, citing McCormick, Evidence (2nd Ed.1972) 655, Section 271; Henry at ¶ 39. Thus," ` "[i]t is today universally conceded that the fact of an accused's flight * * * [is] admissible as evidence of consciousness of guilt, and thus of guilt itself." `"State v. Williams (1997), 79 Ohio St.3d 1 ("Williams I"), 11, quotingState v. Eaton (1969), 19 Ohio St.2d 145, 160, death penalty vacated (1972), 408 U.S. 935; Henry at ¶ 39.
 {¶ 36} We also recognize that, after the shooting, appellant tried to conceal her crime by telling witnesses," `if anybody talks, there will be more of the same.'" (Tr. at 98.) By attempting to conceal Portis' death in such a manner, appellant revealed additional "consciousness of guilt[.]" See Williams I at 11; Henry at ¶ 40.
 {¶ 37} Therefore, based on the above, we conclude that the record allows a reasonable juror to conclude that appellant purposely killed Portis and, therefore, sufficient evidence supports appellant's murder conviction.
 {¶ 38} Next, appellant contends that her murder conviction is against the manifest weight of the evidence. We disagree.
 {¶ 39} In determining whether a verdict is against the manifest of the evidence, we sit as a" `thirteenth juror.'" State v. Thompkins (1997),78 Ohio St.3d 380, 387. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175. We reverse a conviction on manifest weight grounds for only the most" `exceptional case in which the *Page 15 
evidence weighs heavily against the conviction.'" Thompkins at 387, quoting Martin at 175. Moreover," `it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'" State v. Brown, Franklin App. No. 02AP-11, 2002-Ohio-5345, at ¶ 10, quoting State v. Long (Feb. 6, 1997), Franklin App. No. 96APA04-511.
 {¶ 40} Initially, we address appellant's claim that her murder conviction is against the manifest weight of the evidence because she acted in self-defense. In order for appellant to have established self-defense against danger of death or great bodily harm, she must have proven by a preponderance of the evidence that: (1) she was not at fault in creating the situation giving rise to the altercation; (2) she had a bona fide belief that she was in immediate danger of bodily harm and that her only means of escape from the danger was the use of force; and (3) she did not violate any duty to retreat or to avoid the danger. SeeWilliford at 249; State v. Barnes (2002), 94 Ohio St.3d 21, 24;State v. Griffin, Montgomery App. No. 20681, 2005-Ohio-3698, at ¶ 18. The elements of self-defense are cumulative, and if appellant failed to prove any one of the elements by a preponderance of the evidence, she failed to demonstrate that she acted in self-defense. See State v.Cassano, 96 Ohio St.3d 94, 2002-Ohio-3751, at ¶ 73.
 {¶ 41} "By its terms, self-defense presumes intentional, willful use of force to repel force or to escape force." State v. Williams (July 28, 1982), Hamilton App. No. C-810450 ("Williams II"), citing State v.Champion (1924), 109 Ohio St. 281. Thus, a self-defense assertion:
 * * * [R]equires an accused to admit that the action taken to defend himself was deliberate or purposeful, it being the *Page 16 
theory that the ordinary legal consequences of such act do not follow because of the almost universally recognized principle that one is not punishable criminally even for taking the life of another when he has been put under the necessity, or the apparent necessity, of doing so without any fault on his own part in order to protect himself from the peril of death or serious bodily harm at the hands of the person whose life he took. See generally 27 O. Jur. 2d Homicide § 89 et seq. (1957).
(Emphasis sic.) Williams II; see, also, State v. Barnd (1993),85 Ohio App.3d 254, 260 (recognizing that "a defendant claiming self-defense concedes he had the purpose to commit the act, but asserts that he was justified in his actions").
 {¶ 42} Here, appellant suggests that she acted in self-defense during the confrontation with Portis because the firearm discharged while "she had been trying to get control of the gun to keep the decedent from shooting her with it." In support, appellant highlights her testimony that, if Portis had gained control of the firearm, she would "probably be dead right now." (Tr. at 193.)
 {¶ 43} However, through the above assertion, appellant is claiming that the firearm discharged as a result of a struggle for the firearm and not as a result of appellant's intentional and willful act of discharging the firearm. Indeed, at trial, appellant testified that she did not intend to shoot Portis. Accordingly, we conclude that, underWilliams II and Barnd, appellant's own testimony and her above assertion on appeal belie the application of self-defense to the shooting of Portis. While appellant may have been trying to defend herself by struggling to keep Portis from obtaining the firearm, the actual shooting of Portis does not fall under the self-defense affirmative defense, i.e., a claim of justifiable purpose to shoot Portis. SeeState v. LaFreniere (1993), 85 Ohio App.3d 840, 847. *Page 17 
 {¶ 44} Nor can we infer appellant's entitlement to the self-defense affirmative defense from Leslie's testimony that appellant shot Portis after he attempted to reach for the firearm. (Tr. at 33.) Before using lethal force in self-defense, a person must first use any reasonable means of retreat when attacked outside the confines of his or her own home. See State v. Thomas (1997), 77 Ohio St.3d 323, 326-327. "Thus, in most cases, a person cannot simply stand and deliver a lethal blow but must attempt to extricate himself from the confrontation or `retreat to the wall' insofar as possible." State v. Vandergriff, Hamilton App. No. C-030068, 2003-Ohio-7105, at ¶ 15.
 {¶ 45} The person claiming a "home" exception to the duty to retreat requirement must inhabit, even if temporarily, the dwelling itself.State v. Taylor (Sept. 27, 1996), Miami App. No. 95-CA-25. Here, the record does not establish that appellant inhabited the East 18th Avenue residence, and, therefore, we conclude that appellant cannot utilize the "home" exception to the duty to retreat requirement.
 {¶ 46} Likewise, although Leslie testified that appellant shot Portis after Portis attempted to reach for the firearm, appellant failed to establish by a preponderance of the evidence any conformance with her duty to retreat from the kitchen during the confrontation with Portis. Indeed, as noted above, any self-defense theory is negated by appellant's own testimony, where she not only failed to address the duty to retreat issue, but she testified that she did not intend to shoot Portis.
 {¶ 47} For all of these reasons, we reject appellant's contention that her self-defense assertion renders her murder conviction against the manifest weight of the evidence. We now address appellant's argument that the manifest weight of the evidence demonstrates that she did not purposely kill Portis. *Page 18 
 {¶ 48} Appellant testified that she did not intend to kill Portis, but we concluded above that testimony from Leslie and Taylor established otherwise. Appellant argues that the weight of the evidence supported appellant's version of events over the version of events by Leslie and Taylor because Leslie and Taylor provided inconsistent testimony. As an example, Leslie testified that appellant was "[d]irectly in front of" Portis when she shot him, and Taylor testified that, during the shooting, appellant was "standing right over top of [Portis]." (Tr. at 36, 98.)
 {¶ 49} Appellant also argues that the weight of the evidence supported appellant's version of events over Leslie and Taylor's version of events because Taylor was under the influence of drugs during the shooting and because Leslie and Taylor's credibility was impeached by their prior felony convictions. Alternatively, appellant argues that Leslie's testimony actually corroborates appellant's claim that Portis was "reaching for the [firearm] or at least for [appellant]."
 {¶ 50} However, the jury had cause to find incredible appellant's version of events, given her inexplicable testimony that, when she confronted appellant in the kitchen, she placed her firearm on the counter, out of her control and subject to Portis' acquisition. Furthermore, the jury had cause to discredit appellant's version of events, given that appellant displayed a consciousness of guilt by admittedly fleeing the scene after the shooting. See Martinez at 1256;Williams I at 11; Eaton at 160; Henry at ¶ 39.
 {¶ 51} In further challenging Taylor's testimony, appellant attacks Taylor's claim that, after she heard gunshots, she saw that Portis "stood up and was reaching toward [appellant] and he just fell forward." (Tr. at 110.) Appellant challenges such testimony by claiming that "we also know that the fatal head wound would have made it impossible *Page 19 
for the decedent to stand up and reach for the defendant after he had been shot as Taylor indicated. A person can be shot in the heart and run for * * * yards. However, a fatal head wound, of the nature inflicted upon [Portis] would have dropped [Portis] immediately due to the concussive effect upon the brain and its ability to control any voluntary movement." Yet, appellant's assertion is devoid of record support, and we need not consider it.
 {¶ 52} Additionally, appellant contends that the forensic evidence supports appellant's version of events that the shooting occurred during a struggle for the firearm. As an example, appellant first notes that Dr. Fardal testified that Portis' injuries suggest that Portis could have "grabbed the end of the gun" and that Portis' fatal wound could have come from a ricocheted bullet. (Tr. at 135, 140.) However, Dr. Fardal was only testifying hypothetically as to how Portis could have received his fatal injury, and he also provided other alternative explanations.
 {¶ 53} Appellant also argues that the stray bullets in the kitchen at the East 18th Avenue residence evince that "other shots had been fired in a wild fashion." Regardless, in light of the above-noted evidence, we note that appellant's purpose to kill Portis can still exist regardless of whether she also shot stray bullets in the kitchen.
 {¶ 54} Thus, we reject appellant's contention that the weight of the evidence demonstrates that she did not purposely kill Portis and that, therefore, her murder conviction is against the manifest weight of the evidence. Having already concluded that appellant's murder conviction is based on sufficient evidence, we overrule appellant's second assignment of error. *Page 20 
 {¶ 55} We next address appellant's first assignment of error, where appellant initially maintains that the trial court erred when it refused appellant's trial counsel's request for a jury instruction on self-defense. We disagree.
 {¶ 56} "It is well established that the trial court will not instruct the jury where there is no evidence to support an issue." Murphy v.Carrollton Mfg. Co. (1991), 61 Ohio St.3d 585, 591, citing Riley v.Cincinnati (1976), 46 Ohio St.2d 287. Thus, "[i]f the evidence adduced at trial is legally insufficient to raise the issue of self-defense, the court is not obligated to instruct the jury regarding this claim and has discretion to completely remove it from the jury's consideration."Barnd at 259. Here, we concluded above that the record does not support appellant's self-defense assertion. Although, in concluding as such above, we relied on a different reasoning than the trial court in regards to the propriety of a self-defense instruction here, the trial court nonetheless correctly refused to give the self-defense jury instruction and, therefore, we need not disturb the trial court's decision. See State ex rel. McGrath v. Ohio Adult Parole Auth.,100 Ohio St.3d 72, 2003-Ohio-5062, at ¶ 8.
 {¶ 57} Next, appellant argues that the trial court committed plain error by not providing a jury instruction on the defense of accident. We disagree.
 {¶ 58} "The court must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder." State v. Joy (1995), 74 Ohio St.3d 178, 181, citingState v. Comen (1990), 50 Ohio St.3d 206, paragraph two of the syllabus. Here, appellant claims that she was entitled to a jury instruction on the defense of accident. *Page 21 
 {¶ 59} When a defendant raises the defense of accident," `the defendant denies any intent. * * * He denies that he committed an unlawful act and says that the result is accidental.'" State v.Poole (1973), 33 Ohio St.2d 18, 20, quoting 4 Ohio Jury Instructions (1970) 177, Section 411.01. The defense of accident is "tantamount to a denial that an unlawful act was committed; it is not a justification for the defendant's admitted conduct. * * * Accident is an argument that supports a conclusion that the state has failed to prove the intent element of the crime beyond a reasonable doubt." State v.Atterberry (1997), 119 Ohio App.3d 443, 447.
 {¶ 60} As noted above, appellant testified that she did not intend to shoot Portis, but that the shooting occurred when the firearm discharged as a result of a struggle for the firearm between appellant and Portis. Thus, through her testimony, appellant asserted an accident defense. SeePoole at 19; Atterberry at 447. However, appellant's trial counsel did not request a jury instruction on the accident defense, and appellant's trial counsel did not object to the trial court's failure to provide such an instruction. Absent plain error, a party waives error concerning jury instructions if the party fails to object before the jury retires.State v. Jackson (2001), 92 Ohio St.3d 436, 444.
 {¶ 61} According to the plain error doctrine, enunciated in Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial." Barnes at 27. Under the plain error standard:
 * * * First, there must be an error, i.e., a deviation from a legal rule. * * * United States v. Olano (1993), 507 U.S. 725, *Page 22 
732, 113 S.Ct. 1770, 1776, * * * (interpreting Crim.R. 52[B]'s identical federal counterpart, Fed.R.Crim.P. 52[b]). Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * [S]ee, also, Olano, 507 U.S. at 734, 113 S.Ct. at 1777, 123 L.Ed.2d at 519 (a plain error under Fed.R.Crim.P. 52[b] is" `clear' or, equivalently, `obvious'" under current law). Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. * * *
Barnes at 27.
 {¶ 62} Our recognition of plain error, however, is discretionary. See id. Indeed, the Ohio Supreme Court has "admonish[ed] courts to notice plain error `with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" Id., quotingState v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 63} Generally, although a trial court errs by failing to provide a jury instruction on the accident defense when the facts of a case warrant such an instruction," `if the trial court's general charge was otherwise correct, it is doubtful that this error of omission would ever satisfy the [test] for plain error'" by affecting the outcome of the trial. See State v. Smith (May 10, 1996), Miami App. No. 95-CA-17, quoting State v. Stubblefield (Feb. 13, 1991), Hamilton App. No. C-890597; State v. Thomas (Aug. 29, 1997), Hamilton App. No. C-960242("Thomas"). Such is the case "[b]ecause the accident defense is not an excuse or justification for the admitted act," and the effect of such an instruction "would simply * * * remind the jury that the defendant presented evidence to negate the" requisite mental element, such as purpose. Smith; Thomas. In this regard, "[i]f the jury had credited [the defendant's] argument, it would have been *Page 23 
required to find [the defendant] not guilty * * * pursuant to the court's" general instructions. See State v. Manbevers (Sept. 28, 1994), Pickaway App. No. 93CA23.
 {¶ 64} Here, the trial court instructed the jury that appellee bore the burden of proof beyond a reasonable doubt on every essential element of murder, including the "purposely" mental element. The trial court also defined the "purposely" mental element, noting also that "[t]o do an act purposely is to do it intentionally and not accidentally." (Tr. at 243.) Thus, pursuant to Smith, Stubblefield, and Thomas, we conclude that an accident defense jury instruction would not have affected the outcome of appellant's case, and the trial court did not commit plain error by failing to provide an accident defense jury instruction.
 {¶ 65} Lastly, appellant argues that her trial counsel rendered ineffective assistance by not requesting the accident defense jury instruction. Again, we disagree.
 {¶ 66} The United States Supreme Court established a two-pronged test for ineffective assistance of counsel. Strickland v. Washington (1984),466 U.S. 668. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. Id. at 687. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. Id. A defendant establishes prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 67} In Manbevers, the defendant was tried for murder, and his trial counsel did not request an accident defense jury instruction even though the defense at trial was *Page 24 
that, although the defendant shot the victim, he did not intend to do so. The Fourth District Court of Appeals concluded that the defendant's trial counsel did not commit ineffective assistance by failing to request an accident defense jury instruction. The appellate court explained, in part, that:
 The trial court's instructions correctly placed upon the state the burden of proving that [the defendant] purposely caused the death of [the victim]. The effect of an accident instruction would simply have been to remind the jury that [the defendant] presented evidence to negate the element of "purpose." * * *
Id.
 {¶ 68} The appellate court further noted:
 * * * [The defendant's] argument regarding accident was, in essence, an attack upon the state's proof that he purposely caused the death of [the victim]. If the jury had credited [the defendant's] argument, it would have been required to find [the defendant] not guilty of murder pursuant to the court's instructions. The jury's verdict represents a rejection of [defendant's] accident argument. * * *
Id.
 {¶ 69} Again, like Manbevers, the trial court's jury instructions correctly placed on appellee the burden of proving that appellant purposely caused Portis' death; and, in instructing on the "purposely" mental element, the trial court specified that "[t]o do an act purposely is to do it intentionally and not accidentally." (Tr. at 243.) Thus, pursuant to Manbevers and in accordance with Strickland, we conclude that appellant's trial counsel did not commit ineffective assistance by failing to request an accident defense jury instruction. Accordingly, based on the above, we overrule appellant's first assignment of error. *Page 25 
 {¶ 70} Lastly, in her third assignment of error, appellant contends that the trial court erred when it failed to denote in its July 17, 2006 judgment entry that it dismissed the three intimidation counts. Appellee concedes such error and acknowledges that the error can be corrected.
 {¶ 71} We agree with the parties. Pursuant to App.R. 12(B), we have the power to modify judgments when we determine "that the judgment or final order of the trial court should be modified as a matter of law [and we] shall enter * * * judgment accordingly." See, generally,State v. Young (Sept. 28, 1992), Meigs App. No. 461. Thus, we sustain appellant's third assignment of error.
 {¶ 72} Accordingly, we correct the trial court's July 17, 2006 judgment of conviction and sentence to indicate that the trial court dismissed Counts 2, 3, and 4, the R.C. 2921.04 intimidation of a crime victim or witness charges, and the accompanying R.C. 2941.141 and2941.145 firearm specifications.
 {¶ 73} In summary, we overrule appellant's first and second assignments of error and sustain appellant's third assignment of error. In so concluding, we affirm the judgment of the Franklin County Court of Common Pleas as modified above.
Judgment affirmed as modified.
 BRYANT and McGRATH, JJ., concur. *Page 1