DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal is from the January 25, 2008 judgment of the Williams County Court of Common Pleas, which sentenced appellant, Randall D. Snyder, following his jury conviction of violating R.C. 2903.11(A), felonious assault. Upon consideration of the assignments of error, we affirm the decision of the lower court. Appellant asserts the following assignments of error on appeal: *Page 2 
 {¶ 2} "ASSIGNMENT OF ERROR I: TRIAL COUNSEL VIOLATED THE RULES OF PROFESSIONAL CONDUCT BY HIS DUAL REPRESENATION OF APPELLANT AND CO-APPELLANT.
 {¶ 3} "ASSIGNMENT OF ERROR II: THE ADMISSION OF THE DENTAL RECORDS WAS AN ERROR OF LAW AND PLAIN ERROR.
 {¶ 4} "ASSIGNMENT OF ERROR III: THE CONVICTION OF FELONIOUS ASSAULT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE SUFFICIENCY OF THE EVIDENCE.
 {¶ 5} "ASSIGNMENT OF ERROR IV: THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
 {¶ 6} Appellant was indicted on June 20, 2007, by a grand jury on charges of felonious assault, a violation of R.C. 2903.11(A)(1), with a firearm specification, and vandalism, a violation of R.C. 2909.05(A). The following evidence was admitted a trial.
 {¶ 7} Doug Moser, a Williams County Sheriff Deputy, responded to a dispatch at 2:36 p.m. on May 26, 2007, regarding an assault in progress. He arrived at the scene at 2:42:45 p.m. with his lights and sirens off and parked in the driveway. His view of the front porch was blocked, but he could hear an ongoing struggle. When he was closer, he could see Quinn Michael on the floor of the front porch with Noah and Randall Snyder standing over him. Randall Snyder held a handgun in his left hand near Michael's head. *Page 3 
Moser overheard some mumbling and yelling, but could not make out any of their words. Noah Snyder was holding a cell phone in his hand.
 {¶ 8} While the deputy was trying to settle everyone down, Michael was moving off the porch. The deputy was not sure if Michael was just trying to get away from the Snyders or was going after the gun that Randall Snyder had dropped into the landscaping. But, because he had no backup, he handcuffed Michael while he investigated the situation and placed Michael down on the sidewalk. After speaking to all of the parties, he learned that Michael had the gun first and that the Snyders had taken it away from him.
 {¶ 9} The deputy then retrieved the gun and secured it. The gun, which was later determined to be operable, held one round in the camber, which the deputy removed and returned to the magazine clip. At the time of trial, the magazine clip contained ten rounds. The deputy examined the gun and did not find any indication that it had been fired. He and another deputy both testified that they examined the scene and could not find a shell casing or bullet hole in the residence.
 {¶ 10} Deputy Moses took photographs of the injuries everyone suffered. Michael was having trouble breathing and moving. He also had minor cuts and bruises all over. There did not appear to be any damage to Michael's hands. The deputy noted that a screw impression in Michael's back appeared to match the screw head in the molding along the front door. Michael's shirt, which was torn, had some partial footprints and blood stains on it. Randall Snyder had blood on his arm, but the officer did not observe if *Page 4 
it was from an injury or was someone else's blood. A photo taken at the scene showed lacerations on Randall's arm. Noah Snyder had injuries to his hand from the confrontation. The deputy also photographed Randall Snyder's truck showing that it was parked over the boundary line onto Michael's property. He also photographed a dirt pile that was central to the dispute. It appeared to the deputy that the dirt pile was partially on Michael's property.
 {¶ 11} Conflicting testimony was presented about the nature of the relationship between the parties. Michael testified that he and Noah Snyder have been neighbors for about one year. Michael recalled approaching Randall Snyder in a neighborly manner after the property had been purchased while Randall appeared to be trying to determine the property line. When Michael inquired as to what they were planning on doing with the property, Randall had responded with epithets. Michael conveyed the information he had been told about the property lines. Michael also told Randall that he could use what Michael thought at the time was his driveway to access their property. Shortly afterward, the Snyders had the property surveyed and marked off the boundaries and it was determined that Michael's understanding of the property line was incorrect.
 {¶ 12} Michael also testified that some time later, the Snyders gained Michael's permission to store broken up concrete on his property while they built a driveway. Several months later, Michael inquired as to when the concrete would be removed because their driveway had been completed. The Snyders assured him that the concrete *Page 5 
would be removed soon. However, when the concrete remained for another couple of months, Michael called the Williams County Sheriff to make a report about the problem.
 {¶ 13} Noah Snyder, however, described a neighborly relationship between him and Michael. Noah recalled that after his pole barn/home was constructed in the winter of 2005, Michael dropped by to compliment Noah on the barn and the builders. Noah also recalled a time when he planted hundreds of trees along the property line and, with Michael's permission, planted extra trees on Michael's property and agreed to keep up the area around the trees. Michael testified that he could not recall ever being asked by Noah Snyder to plant evergreen trees on Michael's property.
 {¶ 14} Randall Snyder testified, however, that while he had spoken to Michael in the past, he did not have much of a relationship with him. Randall had rarely seen Michael around. Yet, in his written statement made at the sheriffs office after the incident which gave rise to the charges against him, Randall Snyder had indicated that he had experienced prior problems with Michael. Randall did testify at trial that a year earlier there had been complaints made about the dirt on the road from the construction on Noah's property and that Randall had been harassed about it by the sheriff deputy. Randall suspected that Michael had made the complaint.
 {¶ 15} The day before the incident involved in this case occurred, on May 25, 2007, Michael and the Snyders had an argument when Randall Snyder approached Michael concerning a re-rod that Michael had pulled out along the property line. Michael testified that he told them he was concerned that his son would fall on the rod and injure *Page 6 
himself and that Randall Snyder had responded by telling Michael to leave the property pins alone. Randall and Noah told Michael to mind his own business and challenged him to come over onto their property so they could beat him. They called him names and taunted him with epithets and religious slurs. At that time, Michael told them to get the concrete off of his property or he would hire someone to move it and sue them. Michael took his family to a movie to get away from the area for three hours. After he returned home, he decided to borrow a gun from a friend for protection, which he left in his truck.
 {¶ 16} Nancy Michael, Michael's wife, who was present during this incident, testified to the same factual events regarding this incident. Cody Michael, Michael's son who was a fifth grader at the time, testified that he saw his father and the Snyders yelling angrily at each across the property line that day.
 {¶ 17} The Snyders, however, both testified that the facts surrounding this incident were different from what the Michaels portrayed. Noah Snyder testified that on May 25, he and his dad were mowing when they discovered that one of the boundary survey pins had been ripped out of the ground and was in the way of the mower. The pin was a 2x2 stake. Randall Snyder put the stake back in the ground. When they confronted Michael, he whined about it and they told him to leave it alone. Randall Snyder testified that Michael then mocked him by rubbing his eyes and saying "boohoo." But, Randall just walked away. As Noah approached, Michael suddenly became irate and ordered them off of his property. He also told them to get the dirt pile that had been there for two years off the property. Michael told them if they did not remove the dirt, he would have it *Page 7 
removed and bill them. Noah Snyder told Michael to do what he wanted. But, Noah Snyder called a friend that day to arrange to have him use Noah's bulldozer to move the dirt the next day. The Snyders then went back to mowing. Randall denied making any other comments. Noah denied ever threatening to beat Michael up and denied making religious slurs.
 {¶ 18} The following day, on May 26, 2007, the incident that led to the crimes charged in this case occurred. Michael and his son, Cody, testified that Michael planned on making a dirt bike trail in the area of his property along the property line adjoining the Snyder property. He had rented a skid steer to push dirt that was piled up on his property to form a trail. Michael asserted that he was just moving the dirt on his side of the property back to Noah's property and from side to side to smooth out the area. Cody watched his father moving the dirt while he also watched their dog in the backyard. Michael testified that after he had moved two loads of dirt, Noah Snyder came out and stood on the dirt pile on his side of the line and asked Michael was he was doing. Michael responded that he was moving the dirt and Noah told him he could not. Noah then moved in front of the skid steer so Michael could not move the dirt. When Michael tried to move the skid steer to dump another load, Noah attempted to jump onto the machinery.
 {¶ 19} Noah Snyder testified to a different scenario. He recalled that he had heard his bulldozer start up that day and then return 20 minutes later. He went to investigate why his friend had come back because the dirt could not have been moved that quickly. *Page 8 
When Noah went outside, he saw Michael moving the dirt and approached him to question what Michael was doing. Noah walked up onto the dirt pile while Michael was getting a load of dirt. Noah accused Michael of backing up the skid steer and swinging the bucket around toward Noah. Noah yelled at Michael, who responded that he had better move or he would run Noah over. Noah moved, but Michael still almost hit Noah's leg. Michael, however, denied trying to run Noah over. While Noah stated that he wanted to get at Michael, he denied ever trying to grab for Michael because he had a cage surrounding him. However, in his written statements made to the deputy sheriff later that day, Noah admitted that he tried to grab Michael while he was on the dozer.
 {¶ 20} Michael testified that after Noah Snyder tried to grab him, he backed up and swung the skid steer around to leave the area. Michael testified that Noah grabbed a PVC pipe covering one of the stakes on the property line and hit the side of the skid steer at least five times as Michael drove away. Noah admitted only to throwing a PVC pipe at the skid steer out of frustration as Michael drove away. Cody Michael testified that he saw Noah Snyder come running out and around the skid steer. As his father drove toward the house, Cody saw Noah hitting the skid steer with a piece of PVC pipe. Dave Wehrle, a contractor who had rented the skid steer to Michael, testified that he had examined the skid steer and did not find any damage to it.
 {¶ 21} Michael testified that as he was leaving the area, he saw Noah Snyder get on his backhoe, but it would not start. Noah testified, however, that after he threw the *Page 9 
pipe, he returned to his barn and called his father to come over and help him talk it out with Michael and settle the matter.
 {¶ 22} Michael testified that as he headed back to his house on the skid steer he was scared and motioned to his son get a cell phone. As Michael passed by the porch, his son handed him the phone and Michael called 911. Dawn Baldwin, a 911 dispatcher who took the calls that day, testified that Michael's call was automatically logged in at 2:36:43 and lasted 2 minutes and 50 seconds. While making the call, Michael testified, he drove the skid steer to his truck with the intent to get the gun he had stored in it. He stopped the skid steer by his truck and jumped out to get the gun. He loaded a full magazine clip and racked a shell into the chamber. Because the 911 operator suggested that Michael get into his house, he got back in the skid steer and drove toward his house. He could not see Noah Snyder, but presumed he was hiding behind the equipment parked in the area. Michael took a longer route around his house to avoid driving over his concrete driveway, which would have been damaged by the skid steer. He parked the skid steer facing his front door and intended to jump out forward and head straight to his front door.
 {¶ 23} Noah Snyder testified that after Michael drove away, Noah waited alongside his barn for his father to arrive. The Snyders testified that Randall arrived a few minutes later. Deputy Moser testified that Randall had driven his car 15 feet beyond Noah's driveway onto Michael's property. However, the Snyders testified that Randall was not upset at the time because he had not yet learned the specifics of what had happened. Randall testified that he arrived very quickly because he was already driving *Page 10 
and was only three minutes from the property. In his written statement made at the sheriffs office on the day of the incident, Randall stated that he always drove over the property line. However, at the time of trial, Randall testified that he did not normally park in Michael's yard, but did so that day because that was where Noah had met him.
 {¶ 24} The Snyders further testified that when Randall arrived, Noah informed him how Michael had tried to hit him with the skid steer. They decided to go over to Michael's house to talk to him. The Snyders testified that as they walked up Michael's driveway, they saw Michael driving in back of his house and then make an abrupt left turn heading toward them. They acknowledged that had Michael wanted to talk to them, he could have stopped the skid steer and met them. But, Noah and Randall testified that they were headed to the front door and continued walking toward the skid steer after it had stopped at the front of the house.
 {¶ 25} Michael testified that when he stopped near his front door, he jumped forward out of the skid steer and headed toward his door. He could see Randall and Noah Snyder coming really fast toward him. Michael was not able to get his door open because his son had apparently locked it. Michael told the Snyders that he had a loaded gun and that he would use it. He denied ever pointing it at the Snyders. The Snyders caught up with him next to the corner of his door and pushed him against the wall while making religious slurs to him. Both of the Snyders were hitting him. When Michael tried to call 911, Randall grabbed the cell phone and broke it in half. Randall grabbed Michael's wrist trying to take the gun from him. Michael warned him that the gun was *Page 11 
loaded and he did not know if the safety was on or not. As they struggled, Randall and Michael fell into the glass window next to the door enough to smash the glass, but not fall all the way through. Michael fell to the ground. Randall got on top of him and was trying to force the handgun toward Michael's head. Randall also continued to hit Michael. Noah Snyder was stomping on Michael's face. Eventually, Michael let go of the gun. The Snyders continue to stomp on his face and kick his abdomen. Randall kept asking Michael who else was in the house while he pointed the gun at Michael.
 {¶ 26} Cody Michael testified that when his dad motioned for his cell phone, Cody grabbed the phone and passed it to his father while he was still on the skid steer. Cody went back inside and locked the front door and stood nearby. He watched his father and the Snyders while they were on the front porch. He did not see them fighting, but when his father was thrown into the window, Cody called 911. The dispatcher testified that the second call from Cody was automatically logged in at 2:40:29, with a break in the conversation and then a second call logged at 2:42:50. In the middle of the conversation with Michael's son, the sheriff deputy called in from the scene, approximately 2 minutes 21 seconds after Michael's call ended.
 {¶ 27} The Snyders testified to a different scenario. Noah testified that as they approached Michael's front door, Noah yelled to Michael to ask him why he had tried to hit Noah. Both the Snyders testified that when they were only three-to-four feet away from the skid steer, Michael jumped out and pulled out a gun and pointed it at them. Michael told them that it was loaded and the safety was off. Noah immediately moved to *Page 12 
push the gun away and grabbed to put Michael in a headlock or bear hug and force him down. They stumbled across the sidewalk and ended up falling on the porch. Randall grabbed Michael's hands, which were both on the gun, and never let go. Randall testified that he forced the gun to point toward the sky so none of them would get hurt accidentally. After the fall, Randall was on the porch with Michael and Noah was kneeling beside them. Noah was between Michael and the door and window. When Noah lost his grip on Michael and he would not release the gun, Noah punched Michael's forearms up to five times to get him to release the gun. Noah denied ever kicking Michael. Randall denied any kicking or stomping Michael because he had his hands on the gun the whole time. However, at the time he had told the deputy that he may have kicked or hit Michael because he was fighting for his life.
 {¶ 28} Noah heard a gunshot and the window shatter, and then Michael released the gun. Noah testified that no one fell into the window. Randall testified that he also heard a bang and the window break as Michael forced the gun toward Noah. Randall assumed that the gun had fired. Deputy Moser testified that the sound of a gunshot that Cody Michael and the Snyders stated that they heard may have been caused by the popping sound caused by the breaking of the seal of the double-pane window.
 {¶ 29} Randall further testified that three or four seconds after the window broke, he took Michael's gun away and held it in his right hand pointed downward behind him. He then asked Michael if his wife or kids were home, hoping that they had called 911. Michael did not respond, so Randall told Noah to call. Just then, Deputy Moser arrived *Page 13 
and told Randall to throw down the gun. Randall recognized Deputy Moser from Randall's towing business which involved working with law enforcement agencies to tow and impound cars.
 {¶ 30} Regarding their injuries, Randall testified that he had a four-inch gash in his arm. He had blood running out of his ear. He was bleeding on his back from a cut, but could not determine how he had been cut. Noah testified that he suffered a small cut that stopped bleeding by the time the ambulance arrived. He confirmed that his father had a large gash and was bleeding badly. At trial, Randall Snyder testified that he is about 6 feet tall and weighs 230 pounds. Noah testified that he is 6 feet tall, weighs 250 pounds, and has average strength.
 {¶ 31} Michael testified that his upper front teeth were permanently damaged and that he suffered severe bruising and lacerations. His neck and back were out of alignment. The oracle on his eye bone was broken and his eye swelled shut. His nose was broken in three places in a crushed manner. At the hospital, Michael had a CT scan done, but he refused to have the nurse clean up his wounds because he wanted to photograph them himself first. The medical report from the CT scan indicated only a fractured nose, contusions, and abrasions. Michael testified that his medical expenses were approximately $15,000. At the time of trial, nearly seven months later, Michael asserted that he was still suffering from his injuries. He had been off work for six weeks and returned to work in a limited capacity after that. Nancy Michael also testified that when she saw Michael he had numerous bruises, red marks, lacerations, a broken tooth, a *Page 14 
swollen eye, and his jaw appeared to be out of alignment. She testified that Michael was uncomfortable for two weeks afterward and missed six weeks of work. Noah Snyder testified that after he heard about all of Michael's injuries, he went to where Michael was working and took photographs of him scraping shingles off of a roof on June 20, about one month after the incident. However, no photographs were admitted into evidence.
 {¶ 32} The Michaels and Wehrle, the contractor who repaired the Michaels' window, testified that the cost for the repair was $640.
 {¶ 33} Randall Snyder also testified that after he wrote out his statement at the sheriffs office, Deputy Moser took him to another room where he typed out the statement and asked Randall questions. Afterward, the deputy presented a typed statement to Randall, which he signed without reading it.
 {¶ 34} In his first assignment of error, appellant argues that he was prejudiced by his trial counsel's violation of Rule 1.7(b) and (c) of the Rules of Professional Conduct. Appellant contends that his counsel's representation of both appellant and his son/co-defendant violated this rule. At the beginning of trial, the trial court raised the issue of counsel representing both defendants. Appellant's counsel indicated that he would read the applicable law and evaluate again the statements made by the Snyders to the police. Appellant contends that his counsel never discussed the issue. After a break, appellant's counsel asserted that there was no objection to the admission of the statements to the officer as to the issue of the guilt of each defendant. However, on appeal, appellant asserts that he never consented to this waiver of his rights. *Page 15 
 {¶ 35} The Ohio Supreme Court has held that an appellate court does not have jurisdiction over the issue of whether a judge should have been disqualified even when it is raised in the context of voiding or reversing the judgment of the trial court on appeal. Beer v.Griffith (1978), 54 Ohio St.2d 440, 441-442. Likewise, the appellate court does not have jurisdiction over the issue of whether an attorney violated the Rules of Professional Conduct even when it is raised in the context of an appeal. State v. L.F. (May 24, 1996), 6th Dist. No. S-95-013, at 6, certiorari denied (1997), 520 U.S. 1233, citingState v. Frazier (Feb. 17, 1994), 8th Dist. No. 62557, at 8. Appellant's first assignment of error is not well-taken.
 {¶ 36} In his second assignment of error, appellant argues that the admission of dental records was plain error.
 {¶ 37} During Michael's testimony, his dental records were admitted into evidence without objection. Failure to object to an error results in a forfeiture of the right to appeal the error, except that the appellate court may exercise its discretionary power to review plain error. Crim. R. 52(B) and State v. Wogenstahl (1996), 75 Ohio St.3d 344,357, certiorari denied (1996), 519 U.S. 895. Plain errors are those errors that are clearly indicated in the record, apparent to the trial court, State v. Tichon (1995), 102 Ohio App.3d 758, 767, and would have affected the outcome of the trial, State v. Waddell (1996),75 Ohio St.3d 163, 166. The appellate court takes notice of plain error only in exceptional cases in order to prevent a manifest miscarriage of justice.State v. Phillips *Page 16 
(1995), 74 Ohio St.3d 72, 83, certiorari denied (1996), 517 U.S. 1213, citing State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 38} In this case, appellant argues on appeal that Michael's dental records should not have been admitted into evidence because only a two-page record was provided during discovery and a ten-page record was admitted into evidence. Furthermore, appellant alleges that Michael did not properly authenticate the records and they are not self-authenticating. Appellant did not, however, present any argument that the outcome of his trial was affected by the alleged improper admission of these records into evidence. In light of the fact that there was a significant amount of other testimonial evidence to establish that appellant caused serious harm to Michael, an element of felonious assault defined in R.C. 2901.01(A)(5), we find that appellant has failed to establish that the alleged error rises to the level of plain error. Appellant's second assignment of error is not well-taken.
 {¶ 39} In his third assignment of error, appellant argues that, based upon the defense evidence of self-defense, there was insufficient evidence to warrant submitting his case to the jury and that his conviction of felonious assault is contrary to the manifest weight of the evidence. Appellant moved for an acquittal pursuant to Crim. R. 29(A) only as to the evidence to support the specification charge. There is case law holding that appellant would have waived all but plain error regarding the sufficiency of the evidence to support his conviction for felonious assault. See State v. Roe (1989), 41 Ohio St.3d 18, 25. However, more recently, the Ohio Supreme Court has held that the entry of a not *Page 17 
guilty plea preserves the sufficiency of the evidence issue for appeal.State v. Jones (2001), 91 Ohio St.3d 335, 346, certiorari denied (2001),534 U.S. 1004; State v. Carter (1992), 64 Ohio St.3d 218, 223, certiorari denied (1993), 507 U.S. 938; State v. Coe,153 Ohio App.3d 44, 2003-Ohio-2732, ¶ 19.
 {¶ 40} A challenge to the sufficiency of the evidence is a question of law. State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 1997-Ohio-52. The standard for determining whether there is sufficient evidence to support a conviction is whether the evidence admitted at trial, "if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus, citing Jackson v. Virginia (1979),443 U.S. 307. See, also, State v. Thompkins, supra. Therefore, the verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. State v. Dennis, 79 Ohio St.3d 421, 430, 1997-Ohio-372, certiorari denied (1998), 522 U.S. 1128. In determining whether the evidence is sufficient to support the conviction, the appellate court does not weigh the evidence nor assess the credibility of the witnesses. State v.Walker (1978), 55 Ohio St.2d 208, 212, certiorari denied (1979),441 U.S. 924, and State v. Willard (2001), 144 Ohio App.3d 767, 777-778. *Page 18 
 {¶ 41} To meet its burden under R.C. 2903.1(A)(1), the prosecution was required to prove that appellant caused Michael "serious physical harm." "Serious physical harm" is defined by R.C. 2901.01(A)(5) to include:
 {¶ 42} "* * * (b) Any physical harm that carries a substantial risk of death; (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."
 {¶ 43} Upon a review of the evidence, we find that appellant has failed to demonstrate that there was insufficient evidence to submit this case to the jury. Michael, his wife, and the investigating officer testified regarding Michael's injuries. The hospital medical records and photographs also evidence the extent of Michael's injuries. The existence of evidence supporting an affirmative defense of self-defense does not affect a determination of whether there was enough credible evidence upon which a reasonable jury could find the defendant guilty beyond a reasonable doubt. State v. Johnson, 10th Dist. No. 06AP-878,2007-Ohio-2792, ¶ 30, and State v. Cooper, 170 Ohio App. 3d 418,2007-Ohio-1186, ¶ 15.
 {¶ 44} Even when there is sufficient evidence to support the verdict, a court of appeals may decide that the verdict is against the weight of the evidence. State v. Thompkins, supra, at paragraph two of the syllabus. When weighing the evidence, the *Page 19 
court of appeals must consider whether the evidence in a case is conflicting or where reasonable minds might differ as to the inferences to be drawn therefrom, but it cannot re-determine the facts. State v.Smith (1997), 80 Ohio St.3d 89, 114, 1997-Ohio-355, certiorari denied (1998), 523 U.S. 1125. The standard for determining whether a conviction is against the manifest weight of the evidence is whether the appellate court finds that the trier of fact clearly "lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." In making this determination, the court reviews the entire record, weighs the evidence and all reasonable inferences therefrom, and considers the credibility of witnesses.State v. Smith, supra, and State v. Thompkins, supra, at 387.
 {¶ 45} When determining whether the conviction was contrary to the manifest weight of the evidence, appellant's self-defense evidence is taken into consideration. To establish self-defense, appellant was required to demonstrate that: "(1) [he] was not at fault in creating the situation giving rise to the affray; (2) that [he] had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that [he] did not violate any duty to retreat or avoid the danger." State v. Barnes, 94 Ohio St.3d 21, 24, 2002-Ohio-68, citingState v. Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus. Appellant asserts that he met his burden of proving his defense by a preponderance of the evidence and, therefore, the jury clearly lost its way when it found him guilty. *Page 20 
 {¶ 46} We disagree. Under a manifest weight analysis, the appellate court considers the weight of the evidence and the credibility of the witnesses to determine if the jury lost its way in evaluating the evidence. We do not invade the providence of the jury to weigh the evidence and make credibility determinations. Conflicting evidence was presented in this case. When all of the evidence is considered as a whole, we find that the jury did not lose its way in evaluating the evidence. The jury simply found the prosecution's evidence more credible. Therefore, we find that appellant's conviction was not contrary to the manifest weight of the evidence.
 {¶ 47} Appellant's third assignment of error is not well-taken.
 {¶ 48} In his fourth assignment of error, appellant argues that he was denied his Sixth Amendment right under the United States Constitution to effective assistance of counsel. Appellant asserts that his retained counsel failed to fulfill his duty to appellant when he failed to object to the authenticity and admissibility of the dental records evidence; violated the Rules of Professional Conduct by representing both appellant and his son; failed to present a material witness (the friend of appellant's son who had come over that day to move the dirt pile); failed to present character witnesses; failed to present an expert witness to refute the severity of the injuries; failed to object to the jury instructions on complicity; and failed to zealously present the self-defense claim during closing argument. Appellant further argues that the cumulative effect of all of these failings resulted in prejudicial error. *Page 21 
 {¶ 49} Appellant bears the burden of proving that his counsel was ineffective since an attorney is presumed competent. Strickland v.Washington (1984), 466 U.S. 668, 687-689, and State v. Lott (1990),51 Ohio St.3d 160, 174, certiorari denied (1990), 498 U.S. 1017. To meet this burden of proof, appellant must show that: (1) there was a substantial violation of the attorney's duty to his client, and (2) the defense was prejudiced by the attorney's actions or breach of duty.Strickland, supra, and State v. Smith (1985), 17 Ohio St.3d 98, 100. Prejudice is shown where there is a reasonable probability that a different result would have occurred in the case if the attorney had not erred. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus, certiorari denied (1990), 497 U.S. 1011, and State v.Noling, 98 Ohio St.3d 44, 2002-Ohio-7044, at ¶ 108, certiorari denied (2003), 539 U.S. 907.
 {¶ 50} While the reasonableness of the attorney's conduct must be considered in light of the facts of each case, some general rules have arisen from case law. One general rule is that reasoned tactical decisions cannot form the basis for a claim of ineffective assistance of counsel. State v. Hamblin (1988), 37 Ohio St.3d 153, 157, certiorari denied (1988), 488 U.S. 975. Trial counsel does not have to use every piece of evidence they have in their defense if they reasonably believe that it would harm their case. State v. Post (1987), 32 Ohio St.3d 380,388-389, certiorari denied (1988), 484 U.S. 1079. Furthermore, when the claims of ineffective assistance of counsel are based upon facts outside the appellate record, the issue must be raised in a petition for postconviction relief, not on appeal. State v. Hartman,93 Ohio St.3d 274, 299, 2001-Ohio-1580. *Page 22 
 {¶ 51} As to the issues raised in this case, we first find that the issue of ineffective assistance based upon a violation of the Rules of Professional Conduct by representing both appellant and his son is outside of our jurisdiction for the same reasons as stated above under appellant's first assignment of error.
 {¶ 52} Second, even if we agreed that the failure of appellant's counsel to object to the authenticity and admissibility of the dental records evidence was substantial breach of duty, we find that appellant's defense was not prejudiced by the breach of duty because there is no reasonable probability of a different result in the case as discussed under appellant's second assignment of error.
 {¶ 53} Third, as to appellant's claims of ineffective assistance based upon his counsel's failure to present a material witness, character witnesses, and/or an expert witness to refute the severity of the injuries, these are all tactical trial decisions that cannot be second-guessed on appeal. Debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel. State v.Clayton (1980), 62 Ohio St.2d 45, 49, certiorari denied (1980),449 U.S. 879. Without additional evidence, we cannot find that appellant's counsel rendered ineffective assistance of counsel by the manner in which he conducted the defense.
 {¶ 54} Fourth, as to the claim of ineffective assistance based upon the failure to object to the jury instructions on complicity, appellant asserts that there was no evidence in the record that appellant and his son approached Michael with a common purpose of committing a crime. We disagree. There was evidence indicating that the Snyders went *Page 23 
onto Michael's property for revenge. Appellant has failed to establish that his counsel breached a duty owed to appellant.
 {¶ 55} Finally, as to the claim of ineffective assistance based upon a failure to zealously present the self-defense claim during closing argument, we find appellant's argument lacks merit. Appellant's counsel did argue that appellant and his son acted in self-defense after finding themselves in a situation that they neither caused nor anticipated.
 {¶ 56} Appellant further argues that the cumulative effect of all of these failings resulted in prejudicial error. Because we find that all of appellant's claims of ineffective assistance lack merit, this argument fails as well. Appellant's fourth assignment of error is not well-taken.
 {¶ 57} Having found that the trial court did not commit error prejudicial to appellant, the judgment of the Williams County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Williams County.
 JUDGMENT AFFIRMED. *Page 24 
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, J., William J. Skow, P.J., CONCUR. *Page 1