[Cite as *State v. Wilson*, 2021-Ohio-3046.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                              :

    Plaintiff-Appellee,         :

                                   No. 20AP-556

v.                                         :     (C.P.C. No. 03CR-7102)

Demetrius R. Wilson,                       :     (REGULAR CALENDAR)

    Defendant-Appellant.        :

---

D E C I S I O N

Rendered on September 2, 2021

---

**On brief:** [*Janet Grubb*, First Assistant Prosecuting Attorney], and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond.*

**On brief:** *The Law Office of Eric J. Allen*, and *Eric J. Allen*, for appellant. **Argued:** *Eric J. Allen.*

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Demetrius R. Wilson, appeals a final judgment of the Franklin County Court of Common Pleas entered November 19, 2020 denying appellant's motion for an order granting leave to file a motion for new trial. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} On October 24, 2003, appellant was indicted in Franklin County, Ohio on two counts of aggravated murder, in violation of R.C. 2903.01, accompanied by death penalty and firearm specifications; two counts of attempted aggravated murder, in violation of R.C.

2923.02/2903.01, accompanied by firearm specifications; and one count of having a weapon under disability in violation of R.C. 2923.13.

{¶ 3} In a prior appeal to this court, *State v. Wilson*, 10th Dist. No. 05AP-277, 2006-Ohio-643, ¶ 3-30, we described the evidence presented at trial as follows:

> The above charges pertain to a September 21, 2003 shooting. Specifically, the aggravated murder charges stem from appellant fatally shooting Fortino Guzman-Gutierrez ("Guzman") and Jose Isabel Sandoval-Zarko ("Zarko"), and the attempted aggravated murder charges pertain to appellant shooting Leonel Saucedo and Rashaad Marshall.
>
> Appellant pled not guilty and elected to have a bench trial on the weapons under disability charge and a jury trial on the remaining charges. At trial, Clinton Township Police Sergeant Phillip Perry testified as follows on behalf of plaintiff-appellee, the State of Ohio. On the evening of September 21, 2003, the Franklin County Sheriff's Office dispatched Sergeant Perry to Dreamer's Lounge, and Sergeant Perry found Marshall outside the bar. Marshall was frightened and had a wound to his left forearm and in his chest area. Marshall told Sergeant Perry that a Hispanic male shot him.
>
> Officer Denny Blust worked for the Mifflin Township Police Department on September 21, 2003, and testified as follows on appellee's behalf. Officer Blust investigated the area where the shooting involving Marshall occurred. Blust saw that someone had fatally shot Guzman, and someone shot Zarko in the back. Zarko was alive at the time, and medics transported him to the hospital. Blust noted at trial that, although the crime scene was not well-lit on the evening of September 21, 2003, it was "not as dark as in going in a cave where you cannot see your hands in front of your face[.]" (Tr. at 141.)
>
> Next, Allison Gamble testified as follows on appellee's behalf. On September 21, 2003, Gamble lived in an apartment near where the above noted shooting took place. On the evening of September 21, 2003, Gamble drank alcohol and smoked marijuana with individuals that included appellant, Marshall, Franklin Watkins, and Harold Warner. Gamble did not remember if appellant's brother was also present.
>
> That evening, appellant talked about robbing Mexicans. Appellant also had a firearm in his pants waistband. In the course of events, appellant, Marshall, Watkins, and Warner

left the apartment, and Gamble stayed at the apartment. Twenty minutes later, Gamble heard six to seven gunshots.

Franklin County Sheriff Detective Mike Kirkpatrick testified for appellee that he spoke with Marshall at the hospital during the early morning hours of September 22, 2003. According to Detective Kirkpatrick, Marshall stated that he did not shoot anyone and that a Hispanic male shot him. The detective further testified that he took evidence from Marshall's hands for gunshot residue testing.

Franklin Watkins testified to the following on appellee's behalf. On the evening of September 21, 2003, Watkins socialized at Gamble's apartment with individuals including Gamble, Warner, Marshall, appellant, and appellant's brother. Subsequently, Watkins walked with Warner, Marshall, appellant, and appellant's brother to a nearby store. On the way to the store, Marshall told the group that Watkins "told on him" for stealing a video game machine. (Tr. at 236.) Appellant stated that he "would kill anyone who would snitch on him." (Tr. at 237.)

Thereafter, when the group returned to the apartment, appellant and Marshall talked about robbing Mexicans that lived nearby. Marshall had a firearm earlier that evening, but appellant had that same firearm in his pants waistband while talking about the robbery. Afterward, Marshall, appellant, appellant's brother, and a "tall guy" went toward the area where the Mexicans lived. (Tr. at 245.) Warner joined the group later, and Watkins eventually joined them. When Watkins joined the group, he and Warner discussed robbing a pizza delivery person. While Watkins called to order the pizza, he heard two gunshots and started to run away. Watkins heard six or seven more gunshots when he ran across the street. Watkins then saw appellant running toward him, and appellant had the firearm.

Next, Saucedo testified to the following on appellee's behalf. On September 21, 2003, Saucedo socialized with Zarko and Guzman outside an apartment complex. Two black men approached, and one of them asked for beer. Saucedo gave the man two beers and then continued to talk with his friends. Thereafter, the man who asked for the beer grabbed Guzman, put a firearm to his head, and shot him. Instantly, the man then shot Zarko and Saucedo. The bullet grazed the left side of Saucedo's chest.

Subsequently, law enforcement spoke with Saucedo about the shooting and asked Saucedo to identify the shooter in a photo array. Saucedo identified appellant as the shooter.

On direct-examination, Saucedo testified that the location of the shooting was not well-lit and that he remembered the shooter's face "a little bit." (Tr. at 305.) Likewise, Saucedo conceded on cross-examination that he did not see the shooter's face clearly and that the "black men" in the photo array "appear[ed] to be a little bit similar." (Tr. at 342.)

Warner testified to the following on appellee's behalf. Warner socialized with individuals that included Gamble, Watkins, Marshall, appellant, and appellant's brother during the evening of September 21, 2003. At some point that evening, Warner, Marshall, Watkins, and appellant walked to a nearby store. While walking to the store, Marshall mentioned that Watkins "told on him" for stealing a video game machine. Appellant responded: " 'I don't want nobody snitching on me[.]' " (Tr. at 363.)

Subsequently, appellant and Marshall started talking about robbing Mexicans who lived nearby. The group walked toward the area where the Mexicans lived. Appellant then pointed a firearm at a Mexican woman holding a baby and stated: " 'I could pop her like from here.' " (Tr. at 368.)

Meanwhile, Warner decided that the group should rob a pizza delivery person instead. Watkins used his cell phone to order pizza. Appellant and Marshall walked away and, thereafter, Warner heard gunshots. Warner then saw appellant shooting a firearm, although Warner did not see whom appellant was shooting. Warner and Watkins started to run, and appellant, carrying the firearm, ran toward them and stated: " 'I shot the mother fucker.' " (Tr. at 376.)

Afterwards, Franklin County Sheriff Detective Chris Floyd spoke with Warner about the shooting. Warner provided information to Detective Floyd, and the detective later gave money to Warner. However, the money did not influence Warner's testimony. Lastly, Warner testified that he was a closer friend with Marshall than appellant, and Warner admitted that he was previously charged with falsification, but pled to a misdemeanor disorderly conduct under a plea bargain.

Marshall testified to the following on appellee's behalf. Marshall was socializing with individuals including appellant, Gamble, Watkins, and Warner on the evening of September 21, 2003. Marshall never had a firearm that evening, but appellant did.

During the evening, Marshall, Warner, Watkins, and appellant walked to a nearby store. On the way to the store, Marshall confronted Watkins about Watkins revealing that Marshall stole a video game machine. Appellant "said that if somebody snitched on him he felt that he would kill them." (Tr. at 439.) Marshall thought that appellant was joking.

Afterwards, the group returned to Gamble's apartment complex, and the group talked about robbing a pizza delivery person. Meanwhile, appellant and Marshall left the group and approached some Mexicans that lived nearby. Marshall asked one of the Mexicans for a beer. The Mexican, Guzman, gave Marshall a beer and appellant grabbed Guzman and shot him in the head. Marshall did not expect this to happen, stating: "As far as I know it was robbing the pizza place, and when [appellant] told me to walk with him[,] I walked with him." (Tr. at 456.) Next, appellant turned toward Marshall and pointed the firearm toward Marshall. Marshall tried to grab the firearm, but appellant shot Marshall. Marshall fled and heard six to seven more shots. Marshall went to Dreamer's Lounge to ask for help because he was bleeding and could not breathe.

Ultimately, medics transported Marshall to the hospital. At the hospital, a law enforcement officer took samples from Marshall's hands for a gunshot residue test. Marshall had not washed his hands between the time that he was at Dreamer's Lounge and the time that law enforcement took the gunshot residue samples.

On direct examination, Marshall admitted that he first told law enforcement that a Mexican shot him, and that he lied when he made that statement. Marshall further noted that he later falsely told law enforcement that an "unknown subject approached" him and shot him. (Tr. at 426.) Likewise, Marshall admitted to also telling law enforcement that a drug dealer named "G" shot him, and that he again lied when he made that statement. (Tr. at 426.) However, Marshall verified that he ultimately told law enforcement the truth, which was that appellant shot him.

In addition, on direct examination, Marshall testified that appellee charged him with three counts of felony obstruction of justice because of his failure to initially tell the truth about the shooting. Marshall acknowledged that appellee allowed him to plead to one count of obstruction of justice with the possibility of community control in exchange for him testifying against appellant. Likewise, Marshall noted that he was convicted of aggravated robbery and aggravated burglary in 2001.

On cross-examination, Marshall acknowledged that he previously told Warner that appellant was not trying to shoot him, but was trying to protect his life. Marshall also stated on cross-examination that he gave different accounts of the incident because he was scared "for [his] life" due to appellant's actions. (Tr. at 487.)

Ohio Bureau of Identification and Investigation Forensic Scientist Martin Lewis testified on behalf of appellee that he examined the gunshot residue test samples that law enforcement took from Marshall's hands. Lewis stated that he found no gunshot residue from the samples.

Detective Floyd investigated the September 21, 2003 shooting incident and testified as follows on appellee's behalf. First, Detective Floyd learned that Guzman was dead at the crime scene and that Zarko died at the hospital. Next, Detective Floyd spoke with Marshall about the incident, and Marshall originally indicated that a light-skinned man, either black or Hispanic, shot him. Thereafter, Marshall indicated that a man nicknamed "G" shot him. (Tr. at 647.) Ultimately, Marshall confessed that appellant was the shooter. Detective Floyd then asked Marshall to identify appellant in a photo array, but Marshall refused, stating that he was afraid for his family. Marshall also asked what Detective Floyd was "going to do for him[.]" (Tr. at 655.) At a later time, Marshall identified appellant in the photo array.

Detective Floyd also talked with Saucedo about the incident. Saucedo identified appellant in a photo array as the shooter. Detective Floyd also showed Saucedo a photo array with Marshall's photograph, but Saucedo was unable to pick anyone out of that photo array. Likewise, Gamble, Watkins, and Warner spoke with Detective Floyd and provided information about appellant's identity and activities during the evening of September 21, 2003. Eventually, Detective Floyd issued a warrant for appellant's arrest, and appellant

surrendered himself at the jail on October 20, 2003. Appellant had no gunshot wounds when he went to jail.

On direct examination, Detective Floyd verified that he gave Warner $20 after Warner provided information about appellant. Likewise, Detective Floyd indicated that his partner gave Gamble $50 after she provided information about appellant. The money came from the "[f]urther of justice fund, which is seized money." (Tr. at 666.)

Detective Floyd explained that he gave money to Warner because:

A.  At the time of the interview [Warner] had some crisis in his life and he needed his driver's license or something like that and he was cooperative so it's not uncommon in cases like this to pay informants by buying them dinner or cigarettes or pop * * *.

(Tr. at 665-666.) Detective Floyd explained that his partner gave money to Gamble because "[w]e had disrupted [Gamble's] life at that time and she was cooperative[.]" (Tr. at 666.)

Next, Dr. Patrick Fardal from the Franklin County Coroner's Office testified on appellee's behalf that Zarko "died as a result of [a] gunshot wound to the trunk, injuries to the thoracic spinal cord and to the right lung and subsequent internal bleeding." (Tr. at 775.) Dr. Fardal testified that Guzman "died solely and exclusively as a result of suffering a contact gunshot wound to his head which was perforation of the skull and brain, along with a secondary gunshot wound to the trunk, which caused injuries to his left lung, and subsequently causing internal hemorrhaging[.]" (Tr. at 764-765.)

{¶ 4}   Appellant was found guilty by a jury on February 3, 2005 of two counts of murder, a lesser-included offense of aggravated murder, and two counts of attempted murder, a lesser-included offense of attempted aggravated murder.[1]  The jury also found appellant guilty of the attendant firearm specifications.  The trial court merged the firearm

---

[1] Appellant waived his right to a trial by jury as to Count 5 of the indictment, having a weapon under disability, however, the state dismissed Count 5 of the indictment at the conclusion of the jury trial. *Wilson*, 2006-Ohio-643, at ¶ 31.

specifications and sentenced appellant to three years imprisonment on the merged specifications and ordered appellant to serve each prison term consecutively.

{¶ 5} On March 21, 2005, appellant appealed his conviction and sentence arguing his convictions were against the sufficiency and manifest weight of the evidence and also assigned error regarding the trial court's sentencing. *Wilson*, 2006-Ohio-643. This court rendered a decision on February 14, 2006 affirming appellant's convictions; however, this court remanded the matter for a new sentencing hearing. The trial court resentenced and on appeal this court affirmed.[2]

{¶ 6} Appellant filed his motion for leave on August 7, 2020 requesting leave to file a motion for new trial based on a signed affidavit by Rashaad Marshall, recanting his trial testimony and stating appellant had nothing to do with the shooting. On September 9, 2020, plaintiff-appellee, State of Ohio, filed a memorandum contra. On November 19, 2020, the trial court denied appellant's motion for leave without a hearing.

{¶ 7} Appellant filed a timely notice of appeal.

## II. Assignments of Error

{¶ 8} Appellant appeals and assigns the following two assignments of error for our review:

> [I.] THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR LEAVE.
>
> [II.] THE TRIAL COURT ERRED IN NOT HOLDING AN EVIDENTIARY HEARING.

---

[2] In the first appeal, because the trial court did not make the requisite findings in order to impose non-minimum sentences for appellant's convictions for attempted murder, as required by former R.C. 2929.14(B), we remanded the matter for a new sentencing hearing. *Wilson*, 2006-Ohio-643, at ¶ 64. However, when we remanded the case for resentencing, the Supreme Court of Ohio had decided *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856. *Foster* severed a number of sentencing statutes, including former R.C. 2929.14(B), from the statutory scheme. Therefore, on remand, the trial court was no longer required to make specific findings to impose consecutive and non-minimum sentences. On January 19, 2007, the trial court held another sentencing hearing and imposed the same sentence without making any findings. Appellant filed a second appeal on March 19, 2007 arguing *Foster's* severance remedy, as applied to his case, violated due process and ex post facto principles against retroactivity. This court disagreed and affirmed. *State v. Wilson*, 10th Dist. No. 07AP-224, 2007-Ohio-4801, ¶ 4, 6.

On February 8, 2008, the Supreme Court, on consideration of the jurisdictional memoranda filed in the case, denied appellant's request for leave to appeal and dismissed the appeal as not involving any substantial constitutional question. *State v. Wilson*, 116 Ohio St.3d 1480, 2008-Ohio-153.

## III. Analysis

{¶ 9} Appellate courts apply an abuse-of-discretion standard in reviewing a trial court's denial of a motion for leave to file a delayed motion for new trial. *State v. Cashin*, 10th Dist. No. 17AP-338, 2017-Ohio-9289, ¶ 19, citing *State v. Anderson*, 10th Dist. No. 12AP-133, 2012-Ohio-4733, ¶ 9. An abuse of discretion is more than a mere error of law or judgment; instead, it implies that a trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A review under the abuse-of-discretion standard is a deferential review. "It is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14, citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 10} In his first assignment of error, appellant contends the trial court erred in denying his motion for leave to file a motion for new trial. Specifically, appellant argues he proved by clear and convincing evidence that: (1) he was unable to present the testimony now provided by Marshall, (2) Marshall recanted fully, and (3) appellant presented this evidence within a reasonable period of discovery. In his second assignment of error, appellant contends the trial court erred in failing to conduct an evidentiary hearing on his motion for leave.

{¶ 11} Pursuant to Crim.R. 33(A), a new trial may be granted on the motion of the defendant for an enumerated list of causes "affecting materially his substantial rights." Although not specifically enumerated in his motion, appellant moved the trial court for leave to file a delayed motion for new trial claiming newly discovered evidence as grounds for a new trial. As set forth in Crim.R. 33(A):[3]

> A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

---

[3] In a motion for new trial based on newly discovered evidence, a defendant must show that the new evidence: " ' "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." ' " *Cashin* at ¶ 15, quoting *State v. Hawkins*, 66 Ohio St.3d 339, 350 (1993), quoting *State v. Petro*, 148 Ohio St. 505 (1947), syllabus.

* * *

> (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

{¶ 12} Under Crim.R. 33(A)(6), a trial court may grant a motion for new trial based on the discovery of new evidence material to the defense that the defendant could not, with reasonable diligence, have discovered and produced at trial. *State v. Gaven*, 10th Dist. No. 16AP-645, 2017-Ohio-5524, ¶ 14, citing *State v. Graggs*, 10th Dist. No. 13AP-852, 2014-Ohio-1195, ¶ 5. " ' "Newly discovered evidence" is "evidence of facts in existence at the time of trial of which the party seeking a new trial was justifiably ignorant." ' " *Id.*, quoting *State v. Holzapfel*, 10th Dist. No. 10AP-17, 2010-Ohio-2856, ¶ 20, quoting *State v. Love*, 1st Dist. No. C-050131, 2006-Ohio-6158, ¶ 43.

{¶ 13} A motion for new trial based on newly discovered evidence must be filed within 120 days after the jury verdict or the court's judgment. Crim.R. 33(B). However, a trial court may grant a motion for leave to file a motion for new trial based on newly discovered evidence beyond the 120-day deadline in certain circumstances. *See* Crim.R. 33(B).

{¶ 14} Here, the jury rendered its verdict in the criminal trial on the charges of murder and attempted murder and accompanying firearm specifications on February 3, 2005. Appellant's August 8, 2020 motion for leave was filed 15 and one-half years after his conviction; outside the 120-day period set forth in Crim.R. 33(B). Because appellant did not file his motion for new trial within the 120-day deadline stated in Crim.R. 33(B), he was required by the same rule to seek leave from the trial court before filing his motion for new trial. *See State v. Brodbeck*, 10th Dist. No. 17AP-61, 2017-Ohio-7187, ¶ 12. Therefore, as we explain below, Crim.R. 33(B) required appellant's motion for leave to prove, by clear

and convincing evidence, that he was unavoidably prevented within the 120 days from discovering the evidence on which he relies, here Marshall's recantation of testimony he presented at appellant's trial naming appellant as the person who shot him, Guzman, and Zarko.

{¶ 15} "[A] trial court may grant a motion for leave to file a motion for new trial based on newly discovered evidence beyond the 120-day deadline in certain circumstances." *Brodbeck* at ¶ 11. First, the court must determine whether the defendant has met his burden of establishing by clear and convincing proof that he was " ' "unavoidably prevented from the discovery of the evidence upon which he must rely." ' " *Id.*, quoting *Graggs* at ¶ 5, quoting Crim.R. 33(B). "Clear and convincing evidence is ' "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as the facts sought to be established." ' " *State v. Dunkle*, 10th Dist. No. 19AP-820, 2021-Ohio-1035, ¶ 13, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. " '[A] party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence.' " *Brodbeck* at ¶ 11, quoting *State v. Walden*, 19 Ohio App.3d 141, 145-46 (10th Dist.1984). In determining whether a defendant has exercised reasonable diligence, this court has held "the defendant must describe all investigative actions undertaken within the 120-day period for timely filing a Crim.R. 33(A)(6) motion and explain why he was unavoidably prevented from discovering the evidence before the 120-day period elapsed." *Cashin* at ¶ 17, citing *State v. Whiteside*, 10th Dist. No. 15AP-55, 2015-Ohio-3490, ¶ 19; *State v. Ambartsoumov*, 10th Dist. No. 12AP-878, 2013-Ohio-3011, ¶ 25; *State v. Golden*, 10th Dist. No. 09AP-1004, 2010-Ohio-4438, ¶ 19; *State v. West*, 10th Dist. No. 09AP-474, 2009-Ohio-5203, ¶ 13; *State v. Bush*, 10th Dist. No. 08AP-627, 2009-Ohio-441, ¶ 10-11. "Mere conclusory allegations do not prove that the defendant was unavoidably prevented from discovering the evidence he seeks to introduce as support for a new trial." *Cashin* at ¶ 17, citing *State v. Noor*, 10th Dist. No. 16AP-340, 2016-Ohio 7756,

¶ 17; *State v. Waddy*, 10th Dist. No. 15AP-397, 2016-Ohio-4911, ¶ 19; *State v. Anderson*, 10th Dist. No. 12AP-133, 2012-Ohio-4733, ¶ 14; *West* at ¶ 12.

{¶ 16} Second, the trial court must determine whether the party seeking leave under Crim.R. 33 filed the motion for leave within a reasonable time after discovering the evidence supporting the motion under the circumstances. *Brodbeck* at ¶ 11, citing *State v. Armengau*, 10th Dist. No. 16AP-355, 2017-Ohio-197, ¶ 16; *State v. Warren*, 2d Dist. No. 26979, 2017-Ohio-853, ¶ 40.

{¶ 17} On September 9, 2020, the state filed its memorandum opposing appellant's motion for leave to file a motion for new trial. The state argued Marshall had not presented new evidence. The state argued that even though Marshall testified at trial that appellant was the shooter, Marshall's affidavit is consistent with the statement he gave to officers who responded to the scene on the night of the incident. The state contended Marshall's statement to police and his subsequent identification of appellant as the shooter was a matter of credibility that was tested at trial, and one that cannot be re-litigated 15 years later. The state also argued appellant did not present clear and convincing evidence that he was unavoidably prevented from discovering this evidence and has not provided any details documenting when Marshall's undated affidavit was obtained.

{¶ 18} Without holding a hearing, the trial court denied appellant's motion for leave finding the arguments presented by the state were persuasive. The trial court did not provide a basis for not holding a hearing.

{¶ 19} In his first assignment of error, appellant argues the trial court erred in denying his motion for leave and asserts he was unavoidably prevented from discovering the new evidence. Appellant argued in his motion for leave that he "was not expecting Mr. Marshall to ever tell the truth [about] what happened in that alley." (Mot. for Leave at 6.) Appellant stated Marshall contacted appellant's family in 2019, and his family hired his current counsel who sought out to find Marshall. Appellant further asserted his counsel spoke with Marshall while Marshall was incarcerated and Marshall agreed to sign an affidavit, which was executed based on counsel's conversations with Marshall. Appellant stated "[t]his was in late 2019." (Mot. for Leave at 7).

{¶ 20} Attached to his motion for leave, appellant provided his own affidavit, sworn and signed on July 10, 2020, as exhibit C. In his affidavit, appellant averred "he has been

diligent in attempting to prove his innocence [and he] was made aware that Rashaad Marshall wished to recant his testimony [and he] retained counsel to get an affidavit from Mr. Marshall."  (Wilson Aff. at ¶ 3.)  Appellant also stated his counsel made numerous attempts to contact Marshall and was only successful upon Marshall's incarceration. Appellant did not provide, however, any detail regarding when counsel made his attempts to contact Marshall, when counsel met with Marshall or when counsel secured Marshall's affidavit.

{¶ 21} Also attached to his motion for leave, appellant provided the affidavit of Marshall as exhibit A.  Initially, we note Marshall's affidavit is undated and the notary's certification is undated.  Marshall averred in his affidavit that he was pressured by detectives into stating it was appellant who shot and killed the two men.  Marshall further averred it was not appellant who shot and killed the men and that his testimony at trial stating otherwise was false.  Marshall attested appellant had nothing to do with the shooting and it was an unknown male who killed the two men.  Marshall stated he came forward because he felt bad that appellant is incarcerated for a crime he did not commit.  He stated he has not been threatened nor has he received financial compensation for his affidavit. Marshall stated "[h]e would not have said this at the trial or in the years following because he was afraid the police would pin the murder on him.  Only now does he feel comfortable in speaking the truth." (Marshall Aff. at ¶ 5.)  Marshall did not provide further explanation as to why he now feels comfortable coming forward.

{¶ 22} In addition to his own and Marshall's affidavit, appellant provided the affidavit of Kenya Hollingsworth as exhibit B.  In her affidavit, Hollingsworth stated she is an acquaintance of appellant and arranged to hire counsel for him during summer 2019. Hollingsworth averred that in late 2019 "she assisted [appellant] where should [sic] could to get the affidavit of Rashaad Marshall." (Hollingsworth Aff. at ¶ 2.)  Hollingsworth further averred counsel was not paid until summer 2020 because additional fees were required for the case and the COVID-19 pandemic made it difficult to earn money.

{¶ 23} Appellant argues the three affidavits show he was unable to present this testimony within the required 120 days.  On review of the affidavits, we do not find appellant established by clear and convincing proof that appellant: (1) had no knowledge of the evidence he now presents, or (2) could not have learned of the substance of Marshall's

recantation within 120 days of the verdict through the exercise of reasonable diligence. *See Bush* at ¶ 10. Although appellant stated he did not think Marshall would ever "tell the truth [about] what happened," appellant knew Marshall was a witness to the crimes. (Mot. for Leave at 6.) Appellant further argues Marshall was a witness for the state and would have been kept from defense counsel. We do not find this argument persuasive because Marshall's inconsistent statements to law enforcement were reflected in the record. *See Wilson*, 2006-Ohio-643, at ¶ 18-19, 22, 24, 26.

{¶ 24} As detailed above, evidence presented at trial reflects:

> On direct examination, Marshall admitted that he first told law enforcement that a Mexican shot him, and that he lied when he made that statement. Marshall further noted that he later falsely told law enforcement that an "unknown subject approached" him and shot him. (Tr. at 426.) Likewise, Marshall admitted to also telling law enforcement that a drug dealer named "G" shot him, and that he again lied when he made that statement. (Tr. at 426.) However, Marshall verified that he ultimately told law enforcement the truth, which was that appellant shot him.

*Wilson*, 2006-Ohio-643, ¶ 22.

{¶ 25} We cannot agree that clear and convincing evidence established that appellant had no knowledge of the substance of Marshall's recantation and further that appellant could not have learned of the existence of the substance of Marshall's recantation within 120 days of the verdict.

{¶ 26} Further, appellant's conclusory statement that he has diligently worked to prove his innocence is not supported with specific evidence as to his efforts. *See Cashin* at ¶ 17. Appellant did not provide information that would describe investigative action on his part within the 120-day period or the 15 years thereafter. He did not provide the details necessary to determine whether appellant met the requirements for leave that he was unavoidably prevented from the discovery of the evidence within the 120 days.

{¶ 27} Appellant's arguments and evidence also do not show that he met the requirement for leave that he filed his motion within a reasonable time after discovering the evidence supporting the motion under the circumstances. *Brodbeck* at ¶ 11.

{¶ 28} As noted above, appellant's motion for leave and affidavits do not provide information from which a timeline can be determined regarding when Marshall made his

desire to recant known to appellant or appellant's family.  Here, we find this court's analysis in *Dunkle* to be instructive.  In *Dunkle*, the purported newly discovered evidence was the confession of a co-defendant (McWhorter) which the defendant presented to the court more than 11 years after the guilty verdict.  We observed that: (1) while the defendant's affidavit stated that McWhorter contacted him in late 2018, McWhorter's affidavit did not divulge when he contacted the defendant and stated only that he had been incarcerated for over 10 years and wished to set the record straight, (2) McWhorter's affidavit was not dated, and neither the defendant's motion nor his affidavit indicated when McWhorter signed the affidavit or provided it to him, and (3) the defendant stated that his counsel obtained McWhorter's affidavit as soon as he could secure it; however, the defendant's affidavit contained no information regarding counsel's contacts with McWhorter, and the record does not include an affidavit from the defendant's counsel delineating his efforts to obtain McWhorter's affidavit or when the affidavit was obtained.  We determined "it [was] impossible to determine whether appellant secured McWhorter's affidavit within a reasonable time after McWhorter contacted him."  *Id.* at ¶ 25.  We ultimately concluded:

> [E]ven if we were to accept [the defendant's] premise that he was unavoidably prevented from discovering McWhorter's confession because he had no reason to suspect that McWhorter would ever 'tell the truth' about Hough's murder, [the defendant] has failed to demonstrate that he filed his motion for leave within a reasonable time after learning of McWhorter's confession and procuring McWhorter's affidavit memorializing it.

*Id.* at ¶ 23.

{¶ 29} Here, Marshall's affidavit did not divulge when he contacted appellant or appellant's family.  Marshall only stated he came forward because he felt bad that appellant was incarcerated for a crime he did not commit.  Further, Marshall's affidavit did not reflect the date the affidavit was prepared or the date Marshall signed the affidavit.  In his motion for leave, appellant stated Marshall signed the affidavit in late 2019 and there was an "eight-month delay"—but it is not clear whether the eight months refers to the timeframe between the date when Marshall contacted appellant or his family and when appellant hired counsel, or when counsel located Marshall and Marshall signed the affidavit or the signing of

Marshall's affidavit and the filing of his motion for leave. Notwithstanding, the record does not contain an affidavit from counsel delineating his efforts to obtain Marshall's affidavit or when Marshall's affidavit was obtained. Thus, it is impossible to determine whether appellant filed his motion for leave within a reasonable time after Marshall made contact with appellant or his family. Furthermore, the affidavits of appellant and Hollingsworth and the motion for leave attribute the delay in filing to financial difficulties due to the COVID-19 pandemic. In support, appellant points to the Supreme Court of Ohio's tolling of all filing deadlines until July 30, 2020.[4] However, accepting Hollingsworth's statement that she arranged to hire counsel on behalf of appellant in Summer 2019, financial difficulties due to the COVID-19 pandemic would not explain a delay from then until March 2020.

{¶ 30} Therefore, appellant failed to demonstrate that he filed his motion for leave within a reasonable time after learning of Marshall's recantation.

{¶ 31} Because appellant failed to establish by clear and convincing evidence that he was unavoidably prevented from discovering the evidence he now wishes to bring forward and that he filed his motion for leave within a reasonable time after discovering the evidence, we find the trial court did not abuse its discretion in denying appellant's motion for leave.

{¶ 32} Accordingly, we overrule appellant's first assignment of error.

{¶ 33} In his second assignment of error, appellant argues the trial court erred in not holding a hearing. Whether a defendant was unavoidably prevented from discovering the asserted new evidence or was reasonably delayed in filing a motion for leave may require a hearing. *Gaven* at ¶ 16. This court has held " '[i]f the defendant provides documents that *on their face* support the defendant's claim that discovery of the evidence was unavoidably delayed, the trial court must hold a hearing to determine whether there is clear and convincing evidence of unavoidable delay.' " (Emphasis added.) *State v. G.F.*,

---

[4] In re Tolling of Time Requirements Imposed by Rules Promulgated by the Supreme Court and Use of Technology, 3/27/2020, Administrative Action, 2020-Ohio-116, retroactive to March 9, 2020, tolled time requirements set forth in rules of court. The order was to work in conjunction with Am.Sub.H.B. No. 197 which tolled statutorily established time requirements. Both the order and the legislation tolled only those time requirements that were set to expire during the "emergency period," defined as March 9, 2020 through the earlier of the two following dates: (1) the date the Governor's declaration of emergency ends, or (2) July 30, 2020. The order and legislation expired July 30, 2020. *See* Tolling Legislation and Court Orders/Frequently Asked Questions at https://www.supremecourt.ohio.gov/tolling.

10th Dist. No. 18AP-201, 2019-Ohio-3673, ¶ 21, quoting *Bush* at ¶ 8.  Otherwise, the trial court may exercise its discretion regarding whether to hold a hearing on a defendant's motion for leave to file a motion for new trial.  *Id.*, citing *Armengau* at ¶ 33 (finding trial court did not abuse its discretion in denying the defendant's motion for leave to file a delayed motion for new trial without holding an evidentiary hearing where the defendant's affidavit failed to allege facts which would excuse his failure to timely file a motion for new trial); *see*, *e.g.*, *Bush* (finding trial court did not abuse its discretion in denying the defendant's motion for leave to file a motion for new trial without an evidentiary hearing where co-defendant's recanting affidavit exonerated the defendant but nothing in the affidavit supported the conclusion that the defendant could not have obtained the information within 120 days of trial and no evidentiary materials were otherwise provided on this point).

{¶ 34}  In support of his second assignment of error, in his brief, appellant puts forth a one sentence argument: that he showed that he was unavoidably prevented from providing this information to the court within the 120 days as provided in the rule.  He does not point us specifically to any of the documents attached to his motion for leave. Nevertheless, we will review the documents to determine if, on their face, they support a claim that discovery of the evidence was unavoidably delayed.

{¶ 35}  As noted in our discussion of the first assignment of error, in his motion for leave, appellant stated he did not believe Marshall would ever "tell the truth [about] what happened in that alley." (Mot. for Leave at 6.)  In his affidavit, appellant averred he has been diligent in attempting to prove his innocence, he was made aware that Marshall wished to recant his testimony and he retained counsel to get an affidavit from Marshall. Appellant further averred: "Marshall has been reluctant to come forward until 2019-2020." (Wilson Aff. at ¶ 5.)  Marshall stated that he "only recently" came forward because he felt bad about appellant being in prison for something he did not do.  He averred he would not have said this at trial or in the years following because he was afraid police would pin the murder on him, and only "now does he feel comfortable in speaking the truth."  (Marshall Aff. at ¶ 5.)  Hollingsworth stated in her affidavit that she arranged to hire counsel for appellant in summer 2019 and assisted in getting the affidavit of Marshall in late 2019. These averments notwithstanding, appellant did not provide, on the face of the documents,

any evidence regarding timeframe to support his argument that the discovery of the substance of Marshall's recantation was unavoidably delayed.  He did not detail in his own affidavit when he made diligent efforts to prove his innocence or when he was made aware that Marshall wished to recant his testimony.  He states Marshall was reluctant to come forward until "2019-2020," however Marshall's affidavit is undated—providing no context to his use of the phrases "only recently" and "now."  (Marshall Aff. at ¶ 5; Wilson Aff. at ¶ 5.)

{¶ 36}  On the question of whether the discovery of the evidence was unavoidably delayed in this case, we find this court's analysis in *Bush* to be instructive.  *Bush* at ¶ 10.  In *Bush*, "[a]lthough [the defendant] argued in his memorandum in support of the motion that there was no way this information could have been obtained until Caldwell voluntarily came forward with the information in July 2007, no evidentiary materials were provided setting forth any factual basis for this conclusion or otherwise describing any efforts that had been made to obtain the information." *Id.*  Similarly, here, appellant provides no information to establish when and what efforts he put forth to obtain Marshall's recantation.  Moreover, appellant only provides blanket assertions that he has been diligent in attempting to prove his innocence without evidentiary materials detailing this conclusion.

{¶ 37}  Because appellant did not provide documents that, on their face, support his claims that the discovery of the purported new evidence was unavoidably delayed, we find the trial court was not required to hold a hearing.  Furthermore, in light of our discussion regarding the first assignment of error, we find the trial court did not abuse its discretion when it denied a hearing on appellant's motion for leave.

{¶ 38}  Accordingly, the second assignment of error is overruled.

## IV. Conclusion

{¶ 39}  Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT & MENTEL, JJ., concur.

_____